UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| | ) | Case No. 1:06-CR-05-02 |
| v. | ) | Collier/Lee |
| | ) | |
| WILLARD WAYNE HOWARD | ) | |

## REPORT AND RECOMMENDATION

### I. Introduction

Defendant Willard Wayne Howard ("Howard") filed a motion to suppress the search of his vehicle [Doc. No. 50]. At the hearing, Howard also argued his statements to law enforcement officers should be suppressed. Howard contends the evidence gathered as the result of the search of his vehicle and his statements should be suppressed because his arrest was not supported by probable cause, he did not give consent for the search, and he was not given a *Miranda* warning [Doc. Nos. 51 and 74]. Howard's suppression motion has been referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) [Doc. No. 54]. For the reasons stated herein, it is **RECOMMENDED** Howard's motion be **GRANTED**.

### II. Evidence

An evidentiary hearing on Howard's motion to suppress was held on March 16, 2006 [Doc. No. 70]. The government offered the testimony of detectives Joe Renner ("Renner"), Eduardo Choate ("Choate"), and Shane McKee ("McKee") of the Bradley County Sheriff's Office. Howard testified on his own behalf at the suppression hearing.

*Detective Renner's Suppression Hearing Testimony*

Renner is employed with the Bradley County Sheriff's Office and has been a detective since

October 2004 [Transcript of motion to suppress proceedings, Doc. No. 75 ("Tr.") at 14-15][1]. On December 12, 2005, Renner was called to assist McKee and Choate with a traffic stop of a Volkswagen Passat station wagon ("Passat") on the interstate [*id.* at 15]. When Renner arrived on the scene he observed the Hispanic male driver of the Passat, Antonio Benitez ("Benitez")[2], who was already in custody, and five kilograms of cocaine which had been found in the Passat [*id.*]. Renner learned McKee had stopped the Passat for following too closely and subsequently obtained consent to search the Passat [*id.* at 16]. During the search, McKee and Choate located a false compartment in the car which contained the five kilograms of cocaine [*id.*]. Along with the cocaine, Choate seized two cellular telephones from Benitez [*id.*].

Benitez and the seized items were transported to the Bradley County Sheriff's Office and while there one of Benitez's cell phones rang [*id.* at 16-17]. Renner testified Choate[3] answered the phone and told the Hispanic male caller he worked for a towing company, the Passat had been wrecked and towed to the wrecker service, Renner (using an alias) was the owner of the wrecker service, and Renner's cell phone number was the contact number for the wrecker service [*id.* at 17-18]. In response and on the same day, Renner received a telephone call from Amy Cornwell

---

[1] Page references are to the hard copy of the transcript, not the electronic version filed with the Court.

[2] Benitez, a co-defendant, moved to strike his previously filed motion to suppress [Doc. Nos. 63 and 49], and the Court granted the motion to strike [Doc. No. 69].

[3] Renner acknowledged he mistakenly testified at Howard's preliminary examination it was he who spoke with the Hispanic male caller, but since the time of the preliminary examination, he spoke with Choate who refreshed his recollection it was Choate who talked with the Hispanic male caller, not Renner [*id.* at 17, 27].

2

("Cornwell") about the Passat [*id.*]. Renner testified he had numerous conversations with Cornwell[4] about the condition and retrieval of the Passat and related issues [*id.*]. Cornwell told Renner Benitez was her boyfriend and she and her stepfather would come to Cleveland, Tennessee on December 14, 2005 to pick up the Passat [*id.* at 18-19, 35-39]. Renner arranged for Cornwell to meet him at Exit 20 of Interstate 75 to follow Renner to the location of the Passat, and he told her how much it would cost to get the allegedly wrecked Passat out of storage [*id.* at 19].

Based upon his conversations with Cornwell, Renner expected to meet two persons, Cornwell and her stepfather, around 7:00 p.m. at Exit 20 [*id.* at 20, 38]. As planned, Renner met Cornwell and Howard at the exit in a Chevrolet Suburban ("Suburban") and they then followed him to the office of Brewer's Wrecker Service [*id.* at 20]. Upon arrival at Brewer's Wrecker Service, Cornwell exited the Suburban and she and Renner walked into the office [*id.* at 20-21].

In the office, Cornwell paid $327 in cash to Renner to get the Passat out of storage [*id.*]. They then walked over to the garage area where the Passat was located and, as Cornwell was looking at the Passat to see if it was driveable, Renner told her he had found a compartment in the Passat and looked inside of the compartment, and he would call the police if she did not give him $500 [*id.* at 21]. Renner stated Cornwell got a blank look on her face, told him she did not know what he was talking about, and told him he could keep the Passat [*id.* at 22].[5] When Cornwell told Renner she did not know what he was talking about, he gave the code word to signal to the other

---

[4] A log of Renner's many phone conversations with Cornwell, who was not named in the indictment, was introduced as Defendant's Exhibit 1 [*id.* at 30]. Renner stated the log did not list all of his conversations with Cornwell, only the significant ones [*id.*].

[5] Renner was wearing a covert device and his conversation with Cornwell was recorded on both videotape and audiotape [*id.*], but the recordings were not introduced or made exhibits during the hearing.

officers who had the wrecker service under surveillance he was taking Cornwell into custody [*id.* at 22-23]. Renner then handcuffed Cornwell and took her into custody [*id.* at 23, 33].

After the arrest of Cornwell, Renner walked outside to speak with Lieutenant Brian Queen ("Queen"), also of the Bradley County Sheriff's Office [*id.*]. When he returned to the wrecker service office, he observed Choate and McKee speaking with Howard [*id.* at 23]. Renner also saw law enforcement officers, Crosby Jones ("Jones")[6] and Carl Maskew ("Maskew"), in the office with Howard [*id.*]. Renner did not see the arrest of Howard or participate in the search of the Suburban [*id.* at 23-24, 34].[7]

Although Renner only spoke with Cornwell by telephone prior to the arrests, he testified he was suspicious of both Cornwell and Howard because they were coming from Kentucky to Cleveland, Tennessee to pick up a vehicle with five kilograms of cocaine in it [*id.* at 31, 40]. Renner agreed he heard Howard speak and Howard did not sound Hispanic, like the man who originally called Benitez's cell phone [Tr. 29]. Howard never called Renner and Cornwell never mentioned Howard by name [Tr. 30].

***Detective Choate's Suppression Hearing Testimony***

Choate has been a police officer for six years and has been employed with the Bradley County Sheriff's Office for four years [*id.* at 40]. Choate described his participation in the telephone call with a Hispanic male after the arrest of Benitez [*id.* at 92].

Regarding the activities on the evening of December 14, 2005, Choate testified he, McKee,

_____

[6] Agent Crosby Jones was frequently referred to as Agent Crosby in the hearing. For the sake of consistency, he will be referred to by his surname herein.

[7] Renner's testimony in the detention hearing indicates Howard was arrested because he "showed up in general" with Cornwell [Detention Hearing Transcript at 10].

4

and officer Jerry Rogers ("Rogers") were in an unmarked vehicle across the street from the wrecker service [*id.* at 40]. It was already dark outside [*id.* at 43]. Prior to the initial contact by Renner at the exit, Choate was aware that an individual or individuals were coming from Kentucky who were interested in the Passat [*id.*]. While driving from the exit to the wrecker service office, Renner communicated the occupants of a gold, four door Suburban would be arriving at the wrecker service to pick up the Passat [*id.* at 44]. Choate testified he believed the five kilograms of cocaine found in Benitez's Passat was supposed to be delivered to Kentucky[8] and the two occupants of the Suburban had come from Kentucky to recover the Passat [*id.* at 43-44].

After the Suburban arrived and Renner gave the signal, the unmarked vehicle was pulled behind the Suburban [*id.* 43-44, 95]. McKee went into the building, and Choate and Rogers approached the driver's side of the vehicle [*id.* at 45-46]. Choate announced he was with the sheriff's office, and ordered Howard to show his hands and get out of the Suburban [*id.* at 46]. After Howard exited the vehicle, Choate performed a pat down search of Howard and placed him in handcuffs [*id.* at 46, 98]. Choate could not recall if he and/or Rogers had their weapons drawn [*id.* at 97]. Choate unequivocally stated Howard was in custody at that point in time [*id.* at 46-47, 98-99]. Choate and Rogers then walked Howard into a small office in the wrecker service, and Howard was seated in a chair [*id.* at 47]. Choate stated he then left the office and McKee and Jones remained with Howard [*id.*].

Choate went back outside planning to search the Suburban because he had been told the police had probable cause "to begin with" for a search of the vehicle [*id.* at 47; *accord* 111-12].

_____

[8] Choate also testified he was unsure whether Benitez indicated he was traveling to Cincinnati [*id.* at 92].

However, Queen told him to get and use his drug-detection dog, Titan, before searching the Suburban [*id.*]. Choate retrieved Titan from Choate's parked patrol car, which was several blocks away, and then walked Titan around the Suburban [*id.* at 47, 101-103]. At the time he walked Titan around the Suburban, Choate had not received Howard's consent to search the vehicle [*id.* at 48]. When Choate walked Titan around the Suburban, Titan alerted at the rear door of the Suburban on the right side [*id.* at 59-60, 103]. Choate then put Titan back in his patrol car, and he walked into the office where Howard was sitting [*id.* at 62-63].

When Choate returned to the office, McKee and Jones were in the office with Howard [*id.* at 63]. Choate began to give Howard the *Miranda* warning, but stopped when he was told a *Miranda* warning had already been given [*id.* at 63-64, 105]. Choate asked Howard if he had any narcotics, guns, or large amounts of money in the Suburban [*id.* at 65]. Howard stated there were no drugs or guns in the Suburban [*id.*]. Choate then asked Howard if he had large amounts of currency in his car, and Howard did not respond [*id.*]. Choate asked again if Howard had large amounts of money in the Suburban. In response, Howard again stated he did not have guns or drugs in the Suburban, put his head down, and then stated: "You can check it. I don't have that stuff. I don't do that stuff." [*id.* at 65; *accord* 108-10]. Choate described this response as "kind of avoiding the question" and Choate again asked about the money stating, "How much money are we talking about here?" [*id.* at 65]. Choate testified he initially was "really excited" because he thought Howard responded "in the hundreds of thousands" of dollars, but Choate found out later Howard actually said "about a hundred thousand" dollars were in the Suburban [*id.*; *accord* 106]. Choate stated he was going to ask Howard for consent to search the vehicle, but did not feel the need to do so after Howard said, "You can check it." [*id.* at 108-110].

6

Choate testified he did not mention anything about the use of Titan to Howard, and he did not believe Howard knew a drug-detection dog had been "run" [*id.* at 49]. Choate stated when he was speaking with Howard, Howard was speaking clearly and did not appear to be under the influence of alcohol or drugs [*id.* at 66-67]. Choate testified Howard was handcuffed, and did appear to be upset about the questions concerning money [*id.* at 66-67, 109].

Choate also testified extensively about Titan over the continuing objection of Howard [*id.* at 9-11, 49-57, 70-91]. In brief summary, Choate testified he obtained certification for Titan as a drug-detection dog from the National Narcotic Detector Dog Association ("NNDDA"), and Titan's training continues each month in accordance with his department's policy [*id.* at 51-56]. Choate stated Titan's performance as a drug-detection dog has been excellent [*id.* at 55-56]. While Titan has alerted in situations where drugs were not found, Choate does not believe these were false alerts [*id.* at 55-59].

### McKee's Suppression Hearing Testimony

McKee also is a detective in the Bradley County Sheriff's Office [*id.* at 115]. On December 14, 2005, he was with Choate and Rogers at Brewer's Wrecker Service in Cleveland [*id.* at 115-16]. They had been briefed and were waiting for a Suburban to arrive [*id.*]. The three officers saw the Suburban arrive and then waited for a signal from Renner [*id.* at 117]. When they heard the signal, McKee went into the wrecker service, and Choate and Rogers stayed with the Suburban [*id.*].

McKee saw Choate and Rogers bring the driver of the suburban, Howard, into the office of the wrecker service [*id.* at 118]. Choate left the room and McKee was joined by Jones [*id.* at 119]. Jones gave the *Miranda* warning to Howard [*id.*]. McKee said Jones then asked Howard if he wished to speak or remain silent, and Howard began answering questions [*id.* at 121]. McKee stated

Howard appeared upset [*id.* at 122].  Howard asked for cigarettes and someone got cigarettes for Howard [*id.* at 123].  McKee did not recall any of the conversation between Jones and Howard [*id.*].

McKee stated that approximately ten minutes after leaving the room, Choate returned [*id.*].  He stated Choate asked Howard if he understood his rights and then asked Howard if he had anything illegal in the Suburban [*id.* at 124].  Howard responded he did not have guns or narcotics in the vehicle [*id.*].  Choate then asked if Howard had large amounts of cash in the Suburban and Howard responded he had about one hundred thousand dollars in the Suburban [*id.*].  McKee said Howard also told Choate "you can check" when he stated he did not have narcotics or weapons in the Suburban [*id.*].  McKee testified Howard never retracted the "you can check" statement by saying he did not want anyone to check the Suburban [*id.* at 124-25].

### Howard's Suppression Hearing Testimony

Howard stated on December 14, 2005 he was driving his Suburban with his stepdaughter/passenger, Cornwell [*id.* at 134].  The Suburban has three rows of seats in it [*id.*].  Howard followed an individual he believed to be working for a wrecker service to the business; and, he saw Cornwell go into the business to pay for the tow [*id.*].  Howard remained in the Suburban, which was running, with his window down [*id.* at 135].  Howard testified the next thing he knew there was someone standing on his left side with a gun at his head [*id.*].  Howard stated the man told him to get his hands up where he could see them [*id.*].  Howard testified he was scared to death, did not know who the man was, and, as instructed, turned off the ignition [*id.* at 135-36].  He was then helped out of the Suburban, patted down, handcuffed and placed under arrest [*id.* at 136-37, 145].  Howard stated he was taken into the wrecker service and seated in an office [*id.* at 137-38].

Howard testified there were two law enforcement agents in the office with him, but neither

of these agents testified at the suppression hearing [*id.* at 138-39]. He also stated McKee was in and out of the room [*id.*]. Howard stated the agents had a conversation with him, but they never read him his rights [*id.* at 139-40]. Instead, they told Howard he was going to jail and needed to give up any information that would help him [*id.* at 140].

Howard denied telling Choate he could check the Suburban [*id.*]. Howard specifically stated the police never asked for consent to search his Suburban and he never gave consent [*id.* at 140-41]. Howard admitted telling the officers there were no guns or drugs in the Suburban and he also admitted telling them there was about one hundred thousand dollars in the vehicle [*id.* at 142-44, 147]. Howard stated while he was in the office being questioned the officers did not draw their guns, did not scream at him, and he was calm and thinking clearly, but scared [*id.* at 144, 147-48]. He was not taking medication and he had not been drinking [*id.*]. Listing the *only* testimony by the officers at the hearing that he disagreed with, Howard denied any officer ever informed him of his *Miranda* rights, and Howard denied telling the officers they could "check out" the Suburban [*id.* at 143].

Howard admitted he had been arrested on six or seven occasions prior to the arrest at issue, and some of those arrests involved drugs-related charges [*id.* at 145]. During those previous arrests, Howard had been handcuffed and given a *Miranda* warning [*id.* at 146]. He also said he expected one of the officers to read the *Miranda* warning to him at the wrecker service on the night at issue based upon his past arrest experience [*id.*]. Howard stated, in the past he had always exercised his right to remain silent or get an attorney. [*id.* at 151].

Howard also testified he resides in Kentucky and the Suburban belongs to him [*id.* at 141]. He stated that he has a female dog who frequently rides in the Suburban [*id.* at 141-42]. Howard

also said he had known Benitez for about a year and one half [*id.* at 148].

### III. Law and Analysis

Howard was indicted for a conspiracy to possess with intent to distribute five kilograms or more of a mixture and substance containing cocaine and possession with intent to distribute 500 grams or more of a mixture and substance containing cocaine [Doc. No. 20-1, Counts 1 and 3]. Howard asserts evidence resulting from the December 14, 2005 arrest and search should be suppressed because probable cause did not exist for either his warrantless arrest or the warrantless search of his Suburban. Howard also denies he gave consent to search the Suburban, or made a statement such as, "You can check it." In addition, Howard argues his statements regarding the money in the Suburban should be suppressed because he was not given a *Miranda* warning. Howard also makes a number of claims concerning his ability to challenge the reliability and credentials of the drug-detection dog.

Most of the facts are not in dispute. The only significant factual disputes are (1) whether Howard was given a *Miranda* warning prior to stating he had a significant sum of money in the Suburban, and (2) whether Howard told the officers they could "check out" his Suburban. The Court finds the officers' testimony far more credible than Howard's testimony on these factual disputes. Therefore, as set forth in more detail below, the Court concludes: 1) Howard was given a *Miranda* warning prior to making a statement about the money, and 2) Howard stated, "You can check it. I don't have that stuff. I don't do that stuff."

Even with these factual findings in favor of the government, the Court concludes the government has not met its burden of proof with respect to the issues pertinent to suppression. The Court is cognizant of the potentially high cost to society when evidence is suppressed. However,

10

given the record, suppression is recommended.

**(1)** **Probable Cause for Arrest**

There is no bright-line test for determining when an investigatory stop crosses the line and becomes an arrest. *See e.g., United States v. Lopez-Arias*, 344 F.3d 623, 627-28 (6th Cir. 2003). *United States v. Montgomery*, 377 F.3d 582, 587 (6th Cir. 2004), *cert. denied*, 543 U.S. 1167 (2005). In this case, however, the government and its witnesses contend Howard was under arrest or in custody when he was ordered to exit his Suburban [Tr. at 46, 97-99, 135-137]. The government has not argued the law enforcement officers engaged in a brief seizure of Howard for investigative purposes based on a reasonable suspicion of criminal activity, *i.e.,* a *Terry* stop. *See United States v. Terry,* 392 U.S. 1, 30 (1968); *Lopez-Arias*, 344 F.3d at 627. Thus, this matter is being analyzed under the probable cause standard to determine whether law enforcement officers had probable cause for their actions.

The Fourth Amendment to the United States Constitution proscribes only unreasonable searches and seizures. *Scott v. United States*, 436 U.S. 128, 137 (1978); *United States v. Bishop*, 338 F.3d 623, 625 (6th Cir. 2003), *cert. denied*, 540 U.S. 1206 (2004). While the proponent of a motion to suppress generally bears the burden of demonstrating his or her Fourth Amendment rights were violated by a challenged seizure or search, *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978), it is the government's burden to demonstrate a particular seizure was based on probable cause. *United States v. Baldwin*, 114 Fed. Appx. 675, 681 (6th Cir. 2004); *United States v. Wallace*, No. 1:04-CR-96, 2005 WL 2922226, * 9 (E.D. Tenn Nov. 3, 2005).

Warrantless arrests, and searches incident thereto, are permitted where there is probable cause to believe a felony is being or has been committed by the arrested individuals based upon the

11

"totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 230-31(1983); *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988) (citing *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979)). "The Supreme Court has defined 'probable cause' as the 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Criss*, 867 F.2d at 262 (quoting *DeFillippo*, 443 U.S. at 37). As held by the Supreme Court, probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. *Illinois*, 462 U.S. at 244 n.13. The Supreme Court has also held the probable cause standard is a practical, nontechnical conception dealing with the factual and practical considerations of everyday life on which reasonable men, not legal technicians, act. *Maryland v. Pringle*, 540 U.S. 366, 370 (2003). Probable cause is a fluid concept turning on the assessment of probabilities in particular factual contexts, not readily reduced to a neat set of legal rules. *Id.* at 370-71. While the substance of probable cause is a reasonable ground for belief of guilt, probable cause must be particularized with respect to the person to be searched or seized. *Id.* (citing *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)).

The Sixth Circuit Court of Appeals ("Sixth Circuit") has determined the test for the existence of probable cause is wholly objective, and the subjective belief of the arresting officer is irrelevant to determining whether probable cause exists. *United States v. Anderson*, 923 F.2d 450, 456-57 (6th Cir.), *cert. denied*, 499 U.S. 980 (1981). The Sixth Circuit also holds probable cause may be established from the collective knowledge of the police rather than solely from the officer actually making the arrest. *Collins v. Nagle*, 892 F.2d 489, 495 (6th Cir. 1989).

Howard asserts there was no probable cause for his warrantless arrest because all the police

knew about him was that he was present in the Suburban. Howard asserts the police should have known when Cornwell came to Cleveland, she would have someone with her because it would have been impossible for her to drive both her vehicle and Benitez's vehicle back to Kentucky [Doc. No. 74 at 4]. Howard asserts that his mere presence was not sufficient for a valid arrest [*id.*], and that any evidence gathered as a result of the arrest should be suppressed as fruit of the poisonous tree [*id.*].

The government did not directly address the issues of probable cause for Howard's arrest and the fruit of the poisonous tree in its written submissions to the Court [Doc. Nos. 58 and 73], but did argue at the hearing there was "plenty of probable cause" for both the arrest and the search [Tr. at 159]. Focusing on the search of the Suburban, the government asserts there was probable cause for the search because before Howard arrived at the wrecker service officers knew at least one of the occupants of the Suburban (presumably Cornwell) was from Kentucky and had "shown a great deal of interest" in retrieving the Passat; the Passat had concealed five kilograms of cocaine; Cornwell knew Benitez, the transporter of the cocaine; Benitez was arrested heading north along I-75, a roadway "which would get one well into Kentucky and beyond"; and Cornwell had contacted an undercover officer, Renner, regarding the Passat shortly after Renner's cell phone number was provided to a man who had called Benitez's phone [Doc. No. 73 at 3]. The government also asserts the information known to the officers at the time of arrest was supplemented prior to the search by a drug-detection dog alert and a statement by Howard that he had about a hundred thousand dollars in the Suburban. The dog alert and Howard's statement in combination with the facts known at the time of the arrest result in "probable cause overkill" for searching the Suburban, according to the government [*id.*].

13

"Probable cause must exist with respect to each person arrested and 'a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause'" to arrest. *United States v. Martinez-Molina*, 64 F.3d 719, 726 (1st Cir. 1995) (quoting *Ybarra*, 444 U.S. at 91)*; accord United States v. Davis*, 430 F.3d 345, 364 (6th Cir. 2005). "Rather, 'some additional circumstances from which it is reasonable to infer participation in [a] criminal enterprise must be shown.'" *Martinez-Molina*, 64 F.3d at 726 (quoting *United States v. Burrell*, 963 F.2d 976, 986 (7th Cir.), *cert. denied*, 506 U.S. 928 (1992)). Factors considered by a court in making an assessment of the significance of a defendant's association to others who are independently suspected of criminal activity include "whether the known criminal activity was contemporaneous with the association and whether the circumstances suggest that the criminal activity could have been carried on without the knowledge of all persons present." *Id.* (citing *United States v. Hillison*, 733 F.2d 692, 697 (9th Cir. 1984). Other factors considered are "the nature of the place in which the arrest occurred and whether the individual himself was behaving suspiciously or was merely 'tainted' by another." *Id.* (quoting *United States v. Tehrani*, 49 F.3d 54, 59 (2d Cir. 1995)). The court in *Martinez-Molina* noted "the relevant caselaw makes clear, however, that it is often difficult to determine precisely what additional factors are sufficient to create the requisite inference of participatory involvement." *Id.* In *Pringle*, the Supreme Court approved the inference by a police officer that a passenger in a vehicle "will often be engaged in a common enterprise with the driver and have the same interest in concealing the fruits or evidence of their wrongdoing." 540 U.S. at 373.

Howard relies upon the Supreme Court's decision in *United States v. Di Re*, 332 U.S. 581, 583 (1948) and the Sixth Circuit's decision in *Montgomery* to support the argument his arrest was

14

not lawful because, to be reasonable under the Fourth Amendment, an arrest ordinarily must be based on individualized probable cause. In *Di Re*, the police were investigating the sale of counterfeit ration coupons. Working with an informant, the officers monitored a scheduled meeting with Buttitta, who was to buy the coupons. *Id.* The informant entered Buttitta's vehicle at the specified meeting place; and the police approached and saw the informant sitting in the rear seat with two counterfeit coupons. *Id.* The informant, upon questioning, stated he obtained them from Buttitta, who was seated in the driver's seat. The officers then arrested both Buttitta and Di Re, who was in the passenger seat. *Id.* The Supreme Court found no probable cause to arrest Di Re stating:

> An inference of participation in conspiracy does not seem to be sustained by the facts peculiar to this case. The argument that one who "accompanies a criminal to a crime rendezvous" cannot be assumed to be a bystander, forceful enough in some circumstances, is farfetched when the meeting is not secretive or in a suspicious hide-out but in broad daylight, in plain sight of passersby, in a public street of a large city, and where the alleged substantive crime is one which does not necessarily involve any act visibly criminal. If Di Re had witnessed the passing of papers from hand to hand, it would not follow that he knew they were ration coupons, and if he saw that they were ration coupons, it would not follow that he would know them to be counterfeit. Indeed it appeared at the trial to require an expert to establish that fact. Presumptions of guilt are not lightly to be indulged from mere meetings. Moreover, whatever suspicion might result from Di Re's mere presence seems diminished, if not destroyed, when Reed, present as the informer, pointed out Buttitta, and Buttitta only, as a guilty party.

*Id.* at 593-94.

The Sixth Circuit in *Montgomery* noted that, in some instances, merely being a passenger in a vehicle is insufficient for an arrest. 377 F.3d at 589 (citing *Di Re*, 332 U.S. at 593). In *Montgomery*, the police lawfully stopped a vehicle for a speeding violation and, while checking the identification of the occupants in the vehicle, observed a marijuana stem on the floorboard of the

car. *Id.* at 584. The occupants of the vehicle were told the vehicle was to be searched, were asked to exit the vehicle, and were told they were not under arrest but were in investigative custody. *Id.* The occupants of the vehicle were given *Miranda* warnings and placed in the back of a patrol car. *Id.* The search of the vehicle recovered additional marijuana stems and seeds and a digital scale. *Id.* at 585. After the search, the troopers performed a pat down search of the passengers, including Montgomery. *Id.* During the pat down search, a bag of crack cocaine was found in one of Montgomery's shoes. *Id.* The Sixth Circuit, citing *Pringle*, held it was reasonable for the law enforcement officers to infer Montgomery was involved in a common drug-related enterprise with the other occupants of the vehicle because he had visual and physical access to the marijuana stems and drug scales in the vehicle. *Id.* at 585.

In *Pringle*, the Supreme Court held an officer had probable cause to arrest Pringle, one of the three men in a vehicle, reasoning:

> Pringle and his two companions were in a relatively small automobile, not a public tavern . . . . Here we think it was reasonable for the officer to infer a common enterprise among the three men. The quantity of drugs and cash in the car indicated the likelihood of drug dealing, an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him.

*Id.* at 373. Howard argues *Pringle*, where the warrantless arrest of a vehicle passenger was held to be lawful, does not apply because the cocaine and cash were located in an area of the vehicle accessible to all three men arrested after the car was stopped for speeding. 540 U.S. at 367-68.

It is undisputed Howard was placed under arrest prior to the alert by Titan and prior to Howard's statement. Thus, the Court will, as required, determine whether there was probable cause at the time of the arrest based on what are essentially undisputed facts about what was known by the

16

officers prior to the arrest of Howard. Based upon the many contacts between Cornwell and Renner, the police were expecting two individuals, Cornwell and her stepfather, to travel a significant distance to pick up the Passat. As both parties acknowledge, retrieving the Passat from the wrecker service and driving it to Kentucky is not an enterprise which could be accomplished by one person. Cornwell apparently also discussed with Renner whether the Passat could be delivered to her, a suggestion rejected by Renner in his role as the owner of the wrecker service [Tr. at 19; Defendant's Exhibit 1 at 1-2]. Based on the evidence, the Passat, and thus the cocaine in the Passat, was northbound and it may have been objectively reasonable to conclude the cocaine was bound for Kentucky, the same state from which Cornwell and Howard were coming. There are, however, any number of legal reasons why the girlfriend of a driver of a wrecked car would pick up the wrecked car and have a family member transport her to the wrecker service. Even with respect to Cornwell, other than noting she was Benitez's girlfriend, coming from Kentucky, and was interested in retrieving the Passat, the government has pointed to no conduct by or statements of Cornwell indicating she was in any way aware of the drugs in the Passat.

Although the officers had Cornwell's name and information for some two days prior to the meeting at the wrecker service, and even knew she was coming with her stepfather, there is nothing in the record to suggest the officers determined the identity of Howard or discovered his extensive arrest record prior to the arrest. There is no evidence the police were aware of any relationship between Benitez and Howard at the time of the arrest, except that Benitez allegedly dated Cornwell, Howard's stepdaughter. Renner required Cornwell fax a photo identification to him in order to retrieve the Passat [Defendant's Exhibit 1 at 2], but there is no evidence regarding what, if anything, the officers did with that information. There is evidence the officers knew from a phone call to

17

Cornwell that her mother answered the phone [Defendant's Exhibit 1 at 1], but no evidence was offered regarding whether the officers determined if Howard lived with Cornwell. There is also no indication the officers made any effort to obtain a warrant of any kind prior to the arrest and search, although someone communicated with a Bradley County district attorney who reportedly told the officers they had probable cause to be in the car with or without consent [Tr. at 47, 111-112].

No evidence was offered regarding any actions of Howard, either at Exit 20 or at the wrecker service prior to the arrest, which would support a finding of probable cause. Although the officers monitoring the wrecker service gained information about the Suburban while it was in route from the exit to the wrecker service, there is no indication the officers discovered any information about the identity or criminal history of the owner of the Suburban by running the tag. At the time of the arrest, Renner and the other officers, to the extent they could hear the secretly monitored conversation, knew Cornwell disclaimed any knowledge of a compartment in the Passat, knew Cornwell was not going to pay to avoid a call to the police, and knew Cornwell had told the person she believed to be working for the wrecker service that he could keep the car.

Based on the evidence of what was known by the officers at the time of the arrest, the Court concludes it was not reasonable at the time of the arrest for the officers to infer a common enterprise to recover the cocaine in the Passat between Cornwell and Howard. After considering the totality of the circumstances, the Court cannot find the evidence presented by the government supports a finding the warrantless arrest and detention of Howard on December 14, 2005 was supported by probable cause.

**(2)** **The Search**

Because the Court finds Howard was unlawfully detained in violation of his rights under the

18

Fourth Amendment, the fruits of the illegal detention must be suppressed. *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). The government essentially ignores the arrest and detention of Howard took place prior to the search, but argues there was probable cause for the search because there was a fair probability contraband or evidence of a crime would be found in the Suburban [Doc. No. 73 at 3]. The government also relies upon the post-arrest statement of Howard and Titan's alert to support probable cause for the search as noted above. The burden of proof as to whether a warrantless search is proper is on the government. *United States v. Haynes*, 301 F.3d 669, 677 (6th Cir. 2002).

In *Baldwin*, the Sixth Circuit concluded the investigative stop of the car in which Baldwin was a passenger constituted a warrantless seizure and the police did not have a reasonable suspicion to stop and detain him. 114 Fed. Appx. at 681. As a result, the Sixth Circuit stated "[t]he exclusionary rule bars the admissibility of items seized during an unconstitutional search . . . and of testimony concerning knowledge acquired during such a search." *Id.* (quoting *United States v. Leake*, 95 F.3d 409, 411 (6th Cir. 1996)). The exclusionary rule "excludes from admissibility evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Id.* (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). However, as the Sixth Circuit in *Baldwin* noted "[t]he Supreme Court has stated that an illegal police action does not render all subsequently discovered evidence inadmissible per se." *Id.* at 682 (citing *Wong Sun*, 371 U.S. at 487-88)). The question is "'whether, granting establishment of the primary illegality, the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Id.* As in *Baldwin*, because the government failed to meet its burden to demonstrate the initial seizure and detention of Howard and/or his

19

Suburban were legal, evidence from the resulting illegal search is inadmissible.

The exclusionary rule only requires suppression of evidence that is the fruit of the unlawful seizure and detention. *United States v. Perez*, 440 F.3d 363, 373 (6th Cir. 2006). The government has not focused on whether any intervening events occurred which attenuated the taint of the illegal arrest. However, from the proof, Howard was continuously in custody in the office of the wrecker service, and the only event which could have attenuated the taint of Howard's illegal arrest was the giving of *Miranda* warnings.

The Supreme Court has established a number of factors to determine the admissibility of a confession/statement following an unconstitutional arrest:

> The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant.

*Baldwin*, 114 Fed. Appx. at 683 (quoting *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)). It is the government's burden to establish the admissibility of a confession/statement following an illegal arrest or search. *Id.* (citing *Kaupp v. Texas*, 538 U.S. 626, 633 (2003)).

"*Miranda* warnings by themselves are insufficient to purge the taint of an illegal arrest." *Id.* (citing *Brown*, 422 U.S. at 603). The kind of "intervening events that serve to attenuate police misconduct are those that sever the causal connection between the illegal arrest or search and the discovery of incriminating evidence." *Id.* at 684 (citing *United States v. Reed*, 349 F.3d 457, 464 (7th Cir. 2003)). Cases concerning intervening events cited in *Baldwin* include:

> . . . *Rawlings v. Kentucky*, 448 U.S. 98, 108-109, 100 S. Ct. 2556, 65 L.Ed.2d 633 (1980) (discovery of other incriminating evidence implicating defendant); *Wong Sun*, 371 U.S. at 491 (confession was

made several days after illegal arrest and was preceded by
arraignment and release from custody); *United States v. Green*, 111
F.3d 515, 521 (7th Cir. 1997) (proper arrest on unrelated charges
following initial illegal arrest); *United States v. Fazio*, 914 F.2d 950,
958 (7th Cir. 1990) (defendant freely agreed to speak to police at site
away from scene of illegal arrest and drove own vehicle to meeting);
*Carnejo-Molina v. INS*, 649 F.2d 1145, 1149 (5th Cir. 1981)
(consultation with counsel).

*Id. See also United States v. Crowder*, 62 F.3d 782, 786 (6th Cir. 1995), *cert. denied*, 516 U.S. 1057

(1996) (Fourth Amendment violation taints a subsequent confession unless the prosecution

demonstrates not only the voluntariness of the confession, but also a sufficient break in the events

which undermines any inference the confession was caused by the Fourth Amendment violation).

In *United States v. Richardson*, 949 F.2d 851, 854 (6th Cir. 1991), after following

Richardson, but observing no criminal activity, the police approached Richardson and a co-

defendant outside of a storage locker and informed them they were the subject of a drug

investigation. After Richardson refused consent to search the storage locker, he was placed in the

backseat of a police cruiser and his co-defendant was questioned. *Id.* Approximately ten minutes

later, the co-defendant confessed to transporting marijuana for Richardson. *Id.* After approximately

twenty minutes and although he had thrice refused consent to search the storage locker, Richardson

was told of his co-defendant's confession and stated "So you might as well go in;" and "Go ahead

and search since you are going to anyway." *Id.* The officers considered these statements to be

consent and entered the storage locker. *Id.* The Sixth Circuit found the taint of Richardson's illegal

detention was not "dissipated after merely twenty (20) minutes of continued improper conduct.

Thus, we hold that the taint of the illegal arrest vitiated Richardson's consent and . . . the immediate

fruits of the consent should have been suppressed." *Id.* at 859.

There is no testimony as to the exact length of time that elapsed between Howard's arrest

and the search of the Suburban. However, Choate estimated it took him around five minutes to get Titan [*id.* at 91] and McKee estimated the total time Choate was gone at ten minutes [*id.* at 123]. Thus, the total time which elapsed between Howard's arrest, the search/sniff of the Suburban, and Howard's statements to Choate was less than the twenty minutes, which was held to be insufficient to attenuate the taint in *Richardson*.

Under these circumstances, the Court concludes the *Miranda* warning did not attenuate the taint of the illegal arrest. *See Wallace,* 2005 WL 2922226, * 9. Further, the Sixth Circuit has held when a "canine narcotics sniff is performed as the result of the exploitation of a primary illegality, the fruits of that canine sniff must be suppressed." *United States v. Buchanon*, 72 F.3d 1217, 1226 (6th Cir. 1995) (illegal detention case). As probable cause did not exist for Howard's arrest, his statements and the drug dog sniff/alert were the result of the exploitation of the primary illegality, his arrest, and no intervening event has been identified which attenuated the taint of that illegal arrest.

### (3)   Consent to Search

Howard, while detained pursuant to his arrest, purportedly gave consent for the search of his Suburban. It is established an officer with consent needs neither a warrant nor probable cause to conduct a legal search. *United States v. Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996). To justify a search based on an individual's consent, the government has the burden to show by a preponderance of the evidence the consent was freely and voluntarily given and was not the result of coercion, duress, or submission to a claim of authority. *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968); *United States v. Worley*, 193 F.3d 380, 385 (6th Cir. 1999). Consent as an exception to the warrant or probable cause requirement for a search applies only where the consent is valid. *See*

22

*Wallace,* 2005 WL 2922226, *11.

In *Worley*, law enforcement officers noticed the defendant walking through the airport carrying his personal items in a clear plastic bag. 193 F.3d at 382. The defendant was also carrying a beige bag which appeared to contain something heavy. *Id.* The police followed the defendant to the airport lockers and approached him as he was placing the bags into a locker. *Id.* They asked for his identification and boarding pass; and, then, they asked if they could look inside the beige bag. *Id.* at 382-83. The defendant paused and then responded "[Y]ou've got the badge, I guess you can." *Id.* at 383. A search of the bag resulted in the discovery of five plastic "baggies" containing methamphetamine. *Id.* The district court granted the defendant's motion to suppress, and the government appealed asserting the defendant consented to the search of the beige bag. *Id.* at 386. The Sixth Circuit rejected the government's contention stating that it would examine the "content of the statement to ensure that it 'unequivocally, specifically, and intelligently' indicated that the defendant consented." *Id.* at 386 (quoting *United States v. Tillman*, 963 F.2d 137, 143 (6th Cir. 1992)). The Sixth Circuit upheld the district court concluding the government did not show by a preponderance of the evidence the defendant's statement was unequivocal consent rather than an expression of futility. *Id.*

Howard denies making the statements taken as consent by Choate. As previously noted, Howard's denial is not credible. However, the Court also concludes the purported consent does not constitute valid consent to search the Suburban. The Court concludes Howard's statements that "You can check it. I don't have that stuff. I don't do that stuff" do not constitute an unequivocal consent to search the Suburban.

Choate candidly admitted he did not specifically ask Howard for consent to search the

23

Suburban [Tr. at 108-110]. Howard's statement he did not do or have "that stuff" (*i.e.,* guns and drugs) and Choate could "check it," could be interpreted to mean several things other than consent to search the Suburban. Howard's statement could be interpreted to mean his reputation could be checked or drug testing could be conducted on him. The statement also simply could have been Howard's way of attempting to avoid answering Choate's repeated question, as was suggested by Choate in his testimony [Tr. at 65]. Howard, who was in custody and handcuffed, also could have made the statement as an expression of futility indicating he had no ability to interfere with a search of the Suburban by police under the circumstances. The government has not met its burden of establishing by a preponderance of the evidence Howard unequivocally, specifically, and intelligently consented to a search of the Suburban given the totality of the circumstances. *United States v. Butler*, 223 F.3d 368, 375 (6th Cir. 2000).

Even if the Court were to construe Howard's statements as a valid consent, the government has not demonstrated the consent is sufficiently attenuated from the illegal seizure such that the consent is the product of an intervening act of free will. *Lopez-Arias*, 344 F.3d at 629. Under these circumstances, the evidence obtained as a result of the search should be suppressed.

### (4) Statement Regarding Money

Because Howard was the subject of a warrantless arrest without probable cause, his statements to the law enforcement officers, particularly his statement there was about a hundred thousand dollars in the Suburban, should be suppressed as fruit of the poisonous tree. *See*, *e.g.,United States v. Visnich*, 30 Fed. Appx. 524, 530 (6th Cir. Feb. 28, 2002). However, in order to facilitate review of this report and recommendation, the dispute regarding whether Howard was given a *Miranda* warning will be addressed.

24

If police interrogate a suspect in custody before informing him of his rights to remain silent and to have the presence and assistance of retained or appointed counsel during any custodial interrogation, "*Miranda* dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the [government's] case in chief." *Oregon v. Elstad,* 470 U.S. 298, 317 (1985). As noted above, the Court concludes, based on an assessment of credibility, Howard was given a *Miranda* warning. McKee testified he overheard Jones give a *Miranda* warning to Howard. Further, when Choate attempted to give a *Miranda* warning to Howard, he was told Howard had already been advised of his rights. Choate was told this in front of Howard, who did not deny he had been given the *Miranda* warning that night. To accept Howard's testimony he was not given a *Miranda* warning, would require a finding that both McKee and Choate were not credible. To the contrary, having observed the demeanors of Choate and McKee and having listened to their testimony, the Court finds their testimony Howard was advised of his rights to be quite credible. After considering all of the circumstances, the Court concludes the evidence is overwhelming Howard was advised of his *Miranda* rights pursuant to his arrest.

**(5)**     **The Drug-Detection Dog Alert**

The issue of the drug-detection dog alert also will be briefly addressed herein in order to facilitate a review of this report and recommendation. Howard seeks to suppress the alert by Titan on the additional ground the alert was not credible and the government did not establish Titan's credentials as a qualified drug-detection dog [Doc. No. 74 at 11-13]. Howard argues Titan is not reliable and he also has raised questions about Titan's certification. Howard, as an indigent defendant, claims that because funds have not been approved by the Court for Howard to hire an expert to challenge Titan's reliability and perhaps his certification, he has been denied due process

and the ability to challenge facts important to the issue of suppression.

It is well-established a positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance. *United States v. Diaz*, 25 F.3d 392, 394-95 (6th Cir. 1994). For a positive dog reaction to support a determination of probable cause, the training and reliability of the dog must be established. *Id.* at 394. After it is shown that a drug-detection dog is certified, all other evidence relating to accuracy goes only to the credibility of the testimony, not to the dog's qualifications. *United States v. Boxley*, 373 F.3d 759, 762 (6th Cir.), *cert. denied*, 543 U.S. 972 (2004). The government has stated it does not intend to use any evidence of the alert at trial [Doc. No. 59 at 1]. As noted above, should the government attempt to use the alert, it was performed as the result of the exploitation of Howard's illegal arrest, and it would be suppressible as fruit of the poisonous tree. *Buchanon*, 72 F.3d at 1226.

## IV. Conclusion

For the reasons stated herein, it is **RECOMMENDED** Howard's motion to suppress [Doc. No. 50] be **GRANTED** and evidence of Howard's statements and the money seized from the Suburban **BE SUPPRESSED**.[9]

s/*Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[9] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).