UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | No. 1:06-cr-05 |
| v. ) | |
| ) | Chief Judge Curtis L. Collier |
| ) | |
| WILLARD WAYNE HOWARD ) | |
| ) | |

**M E M O R A N D U M**

In this matter, the Court is being called upon to authorize the appointment of an expert in connection with a suppression hearing. A key issue to be determined at the suppression hearing is whether the drug-detection dog's alert provided probable cause. After considering the specific facts of this case, the arguments of counsel, and the applicable law, the Court will **DENY** the Defendant's Motion for Reconsideration of Appointment of Expert (Court File No. 91).

**I.     INTRODUCTION**

This matter comes before the Court as a Motion for Reconsideration of Appointment of Expert filed by Defendant Willard Wayne Howard ("Defendant") (Court File No. 91). Defendant is seeking $4,300, pursuant to 18 U.S.C. § 3006A(e), to cover the services and expenses of Mr. Robert Gonzalez, an expert whose "experience with detection canines is extensive and includes five years of service as the Branch Manager of the 37th Security Forces on Lackland Air Force Base in Texas." (Memorandum In Support, Court File No. 92 at 10). Defendant asserts he is in need of an expert to aid in analyzing the records and training of the drug detection dog Titan ("Titan") and

Titan's handler, Detective Eduardo Choate of the Bradley County, Tennessee Sheriff's Office. Defendant filed the current motion on June 20, 2006 (Court File No. 91), and the Government timely filed a response on July 13, 2006 (Court File No. 94).

Because the Court has a great number of criminal cases that are initiated by or involve drug detection dog alerts and a general request such as that made here could be made in almost every such case, the Court will examine the request at some length. In light of the particular facts of this case, the specific expertise of the named expert, and the general nature of the request here, the Court is not persuaded the services of Mr. Gonzalez are necessary or would be helpful in the probable cause determination by the judicial official called upon to make the probable cause determination. The Court is concerned that if it approved this request based on the general arguments advanced by Defendant, the Court would be required to approve this request in every case involving an alert by a drug-detection dog. Such a requirement would be unduly burdensome given the frequency with which dog alerts are used as a basis for probable cause. It is conceivable the facts surrounding a particular dog alert would warrant the services of an expert, but no such facts have been identified here. The Court will explain its reasoning in detail.

## II. STANDARD OF REVIEW

Defendant makes his request pursuant to 18 U.S.C. § 3006A(e). Section 3006A(e) reads:

1) Upon request. Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation may request them in an ex parte application. Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court, or the United States magistrate if the services are required in connection with a matter over which he has jurisdiction, shall authorize counsel to obtain the services.

18 U.S.C. § 3006A(e). Pursuant to 18 U.S.C. § 3006A(e), counsel for an indigent criminal defendant may request the district court to authorize the expenditure of funds for investigative, expert, or other services. *See, e.g.*, *United States v. Clark*, 385 F.3d 609, 617 (6th Cir. 2004); *United States v. Osoba*, 213 F.3d 913, 915-16 (6th Cir. 2000). The Court "shall authorize" counsel to obtain such services "[u]pon finding, after appropriate inquiry in an *ex parte* proceeding, that the services are necessary for adequate representation." 18 U.S.C. § 3006A(e)(1).

In the United States Court of Appeals for the Sixth Circuit ("Sixth Circuit"), services requested under 18 U.S.C. § 3006A(e) in the context of a criminal prosecution are "necessary" if a defendant can demonstrate (1) such services are necessary to mount a plausible defense, and (2) without them, the defendant's case would be prejudiced. *United States v. Gilmore*, 282 F.3d 398, 406 (6th Cir. 2002). The amount of compensation for authorized services is generally not permitted to exceed $1,600 (exclusive of expenses reasonably incurred). 18 U.S.C. § 3006A(e)(3). Funds greater than $1,600 may be obtained only upon the district court's certification that the amount in excess of the limit is "necessary to provide fair compensation for services of an unusual character or duration" and subsequent approval by the Sixth Circuit. *Id.* If the Court is in doubt, the Court should err in favor of approving the request.

### III. FACTUAL AND PROCEDURAL BACKGROUND

In an earlier memorandum (Court File No. 89), the Court set out the facts as developed at the initial suppression hearing before Magistrate Judge Susan K. Lee and from the submissions of the parties. The Court will repeat and supplement those facts.

On December 12, 2005, Bradley County, Tennessee Sheriff's Office Detectives Joe Renner

("Renner"), Eduardo Choate ("Choate"), and Shane McKee ("McKee") were involved in a traffic stop of Antonio Benitez ("Benitez"). Benitez was pulled over for a minor traffic violation in Bradley County while headed north on Interstate 75. Benitez was driving a Volkswagen Passat, which was not registered to him, without a driver's license. The detectives found five kilograms of cocaine located in a false compartment in the Passat and two cell phones. The detectives seized the items and transported Benitez to the Bradley County Sheriff's Office. While there, one of the cell phones rang. Choate answered the phone and told the unidentified Hispanic male caller he worked for a towing company and the Passat had been wrecked and towed to the wrecker service. He gave the caller Renner's cell phone number as a contact number for the wrecker service.

Later that day, Renner received a telephone call from Benitez's girlfriend, Amy Cornwell ("Cornwell"). Cornwell asked about the condition of the Passat, how much it would cost to get it out of storage, and its location. There is no evidence Cornwell attempted to contact Benitez. Cornwell told Renner she and her stepfather would drive to Cleveland, Tennessee to pick up the Passat on December 14, 2005. No officer or detective attempted to obtain a search or arrest warrant.

On December 14, 2005, Defendant drove a Chevrolet Suburban, with Cornwell as a passenger, from Kentucky to Cleveland, Tennessee to pick up the Passat. Upon arriving at the wrecker service, Cornwell walked into the office while Defendant remained in the Suburban. Renner, acting in an undercover capacity as a wrecker service employee, told Cornwell a secret compartment had been found in the Passat and he would call the police if she did not give him $500. Cornwell told Renner she did not know what he was talking about and he could keep the Passat. Renner then arrested Cornwell.

At about the same time, Choate, McKee, and Bradley County, Tennessee Sheriff's Office Detective Jerry Rogers ("Rogers") ordered Defendant out of the Suburban, arrested him, took him into a small office in the wrecker service, and apprised him of his *Miranda* rights. Choate then retrieved his drug-detection dog, Titan. Titan walked around the Suburban and responded to the rear door of the Suburban, and Choate interpreted Titan's response as an alert to the presence of illegal drugs. After Titan alerted, Choate went into the office where Defendant was being held and asked him if he had any narcotics, guns, or large amounts of money in the Suburban. Defendant stated there were no drugs or guns in the Suburban. Choate then asked Defendant if he had large amounts of currency in his car. Defendant did not respond so Choate asked again if he had large amounts of money in the Suburban. Defendant responded he did not have any guns or drugs and then said, "You can check it. I don't have that stuff. I don't do that stuff." Afterwards, the Suburban was searched. The search yielded approximately $100,000 in cash.

The current motion comes before the Court in connection with the Motion to Suppress the Search of Defendant's Vehicle, filed on February 16, 2006 (Court File No. 50). Magistrate Judge Lee conducted an evidentiary hearing on the motion to suppress and filed a report and recommendation ("R&R") recommending Defendant's motion be granted on the grounds Defendant's arrest was illegal (Court File No. 78). Based on that recommendation, Magistrate Judge Lee issued an order denying as moot Defendant's initial Motion for Appointment of Expert (Court File No. 50).

In its Memorandum and Order dated June 6, 2006, the Court accepted and adopted the R&R in part, with the exception of the conclusion that the evidence found inside the vehicle should be suppressed (Court File No. 89, 90). In its objections to the R&R, the Government argued if probable

-5-

cause to arrest Defendant was not present, the evidence obtained from the search of the Suburban would still be admissible under the independent source doctrine if Titan's alert was found to be wholly independent from the illegal arrest (Court File No. 80). The Court raised the related issue of whether the evidence seized from the vehicle would have been inevitably discovered by lawful means (Court File No. 89). These issues were referred to Magistrate Judge Lee to take further evidence and make a recommendation whether Titan's alert was independent of the illegal arrest and whether the evidence seized in the Suburban would have been inevitably discovered by lawful means (Court File No. 90).

In response, Defendant filed the current Motion for Reconsideration of Appointment of Expert on June 20, 2006 (Court File No. 91). In his supporting memorandum Defendant identifies Mr. Gonzalez and offers the following description of Mr. Gonzalez's background and expertise:

> Based on my conversation with [Mr. Gonzalez], and a review of his curricula vitae, . . . there seems to be little question that he is more than qualified to serve as an expert under the circumstances and would certainly satisfy the needs of the defense in this cause. His experience with detection canines is extensive and includes five years of service as the Branch Manager of the 37th Security Forces, on Lackland Air Force Base in Texas which, among his many responsibilities, he managed all military working dogs on the base and insured they were being properly and optimally utilized for security purposes; was selected by the Air Force Headquarters Security Police to be the Team Leader, trainer, and coordinator on the United States Customs Canine Drug Interdiction Force to Puerto Rico; Mr. Gonzalez additionally served as a Branch Manager for the 16th Security Forces in the Air Force, where, for six years his oversight duties included managing three narcotic detection dog teams and three explosive detection dog teams. Mr. Gonzalez's experience with handling narcotic dog teams for purposes of law enforcement dates back to as far as 1979.

Court File No. 92, pp 10-11.

Defendant's supporting memorandum argues expert services are necessary for several

reasons: "to determine if the [National Narcotic Detector Dog Association ("NNDDA")][1] utilizes acceptable methods in its certification process"; to determine the meaning of the dog's performance and training records; and because "[w]ithout access to its own expert with respect to the capabilities of these dogs, their training, and the type of skills which the animal must acquire in order to render reliable 'alerts' on contraband, the defense will not be able to properly challenge the admissibility of evidence with respect to contraband located by Titan" (Court File No. 92 at 5, 12). The Government timely filed a response on July 13, 2006 (Court File No. 94).

**IV.     ANALYSIS**

From Defendant's arguments the Court must consider five issues: (1) if the NNDDA utilizes acceptable methods in its certification process; (2) the meaning of the dog's performance and training records; (3) the capabilities of drug detection dogs; (4) the training of drug detection dogs, and (5) the type of skill which drug detection dogs must acquire in order to render reliable "alerts" on contraband.

The issue before the Court is whether the services of an expert with experience in managing and training narcotic-detection dogs are necessary for Defendant to mount a plausible case during the suppression hearing. Defendant will be attacking the Government's assertion of probable cause. If successful, this would result in the suppression of evidence found as a result of the alert by Titan.

---

[1] The NNDDA is an organization comprised of approximately 2500-3000 dog handler members. The board of directors sets the requirements each handler must meet for certification. Certification must be completed annually. The requirements for certification, a detailed description of the certification process and policies regarding canine certification can be found at National Narcotic Detector Dog Association Home Page, http://www.nndda.org (last visited Aug. 24, 2006).

-7-

In addressing this issue the Court will be looking for (1) the necessity of the expert assistance[2], (2) whether the expert would be helpful to the finder of fact[3], and (3) whether Defendant can mount a plausible case for suppression of the evidence[4].

The starting point for an analysis is *United States v. Diaz*, 25 F.3d 392 (6th Cir. 1994). *Diaz* is the key case in the Sixth Circuit on probable cause established by dog alerts. In *Diaz*, the defendant appealed his conviction arguing his motion to suppress was erroneously denied. The defendant contended the discovery of the drugs in the case by a police dog was insufficient to establish probable cause because the dog was improperly trained. The court held that a trained and certified dog can establish probable cause. *Id.* at 393. An evidentiary hearing was held in the district court where defendant, his drug detection dog expert, the dog's trainer-handler, and one of the drug agents testified. The district court denied the motion to suppress finding the dog's alert provided probable cause. The court in *Diaz* upheld this decision stating "[i]n this case, the dog sniff is determinative of the issue of probable cause to search Diaz's car; before the dog alerted on the car, probable cause for a search did not exist. A positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance." *Id.* at 393-94 (citation omitted).

The court stated "[f]or a positive alert to support a determination of probable cause, the training and reliability of the dog must be established." *Id*. at 394 (citation omitted). The Sixth Circuit analogized to principles of evidence law on expert testimony to determine the quality and

---

[2] 18 U.S.C. § 3006A(e).

[3] Fed.R.Evid. 702.

[4] 18 U.S.C. § 3006A(e).

-8-

quantity of evidence necessary to establish a dog's training and reliability, comparing it to the qualification of an expert witness. *Id.*

Starting with the proposition that for expert testimony to be admitted as evidence, a court must first determine if the expert is qualified, the court went on to discuss the rules governing expert testimony. *Id.* Once an expert is qualified, all other evidence that contradicts or undermines the expert's testimony goes only to the expert's credibility, not his qualification to testify. *Id.* In determining the qualifications of an expert, the "court considers the proffered expert's education and experience." *Id.* (citation omitted).

Utilizing the principles relating to expert testimony, the court determined in the case of a drug-detection dog, evidence "that the dog is generally certified as a drug detection dog" is sufficient to establish the dog's training and reliability so as to admit the evidence of its positive alert. *Id.*

> When the evidence presented, whether testimony from the dog's trainer or records of the dog's training, establishes that the dog is generally certified as a drug detection dog, any other evidence, including the testimony of other experts, that may detract from the reliability of the dog's performance properly goes to the "credibility" of the dog. Lack of additional evidence, such as documentation of the exact course of training, similarly would affect the dog's reliability. As with the admissibility of evidence generally, the admissibility of evidence regarding a dog's training and reliability is committed to the trial court's sound discretion.

*Id.*

From *Diaz* it is clear that for evidence of the dog's alert to be admitted on the issue of probable cause, all that is required is evidence the dog is generally certified as a drug-detection dog. Questions about the quality of the dog's training, the dog's performance in the field, and other issues go to credibility and not the admissibility of the evidence. Cases following *Diaz* have adhered to this position. *See, e.g., United States v. Boxley*, 373 F.3d 759, 762 (6th Cir. 2004) ("[A]fter it is shown that the dog is certified, all other evidence relating to his accuracy goes only to the credibility

-9-

of the testimony, not to the dog's qualifications."); *United States v. Hill,* 195 F.3d 258, 273 (6th Cir. 1999) (holding defendants' challenge to drug dog's training and reliability on grounds the government failed to produce records was without merit). While further evidence is not necessary to allow the admission of testimony relating to the dog's alert, it may be relevant to the extent it can be used to support or challenge the "credibility" of the dog. A trier of fact may find the credibility of the testimony relating to the dog's training and reliability sufficiently questionable so as to determine the dog's alert was unreliable even though the dog had been properly certified. While *Diaz* addressed the quality and quantity of evidence necessary to establish the minimum standard of training and reliability for admissibility of evidence of a positive alert, no case to date in the Sixth Circuit has answered the question of the quality and quantity of evidence sufficient to undermine the credibility of a dog and its handler once certification is established. In the absence of definitive case law, the Court will look to the science and training behind dog sniffs to determine what factors will most affect the credibility of a dog's positive alert.

      **A.**      **Whether the NNDDA Utilizes Acceptable Methods in its Certification Process**

Defendant argues he needs the assistance of Mr. Gonzalez to help him determine whether the NNDDA utilizes acceptable methods in its certification process. From the testimony of Detective Choate at the suppression hearing, it is clear Titan was certified. His certification was provided by the NNDDA. From the transcript of the hearing and the arguments in Defendant's brief, Defendant does not contest the fact of certification. Rather, Defendant argues he wishes to challenge the methods NNDDA uses in its certification process. Any evidence along these lines goes not to whether the testimony of the alert was admissible, but to how much credibility the evidence carries. There is nothing in Mr. Gonzalez's submitted background to suggest he has any expertise in opining

-10-

on the qualifications of drug detection dog certification associations or any particular knowledge of this particular credentialing organization. Moreover, there is nothing in Mr. Gonzalez's submitted background to suggest he is aware of nationally or generally accepted standards on the certification of drug-detection dogs. Unless there are such generally accepted standards, and assuming he offered an opinion that the NNDDA certification process was deficient, Mr. Gonzalez's testimony would only amount to him having a contrary opinion and would likely not even be admissible at the suppression hearing. Defendant's argument here is akin to someone wanting to challenge the testimony of a properly licensed medical doctor by attempting to show the licensing agency failed to ask the proper questions.

### B. Meaning of Titan's Performance and Training Records

Defendant argues he needs the assistance of Mr. Gonzalez to help him determine the meaning of Titan's performance and training records. Again, any evidence along these lines goes to the credibility to be placed on Titan's alert. Titan was certified. Defendant may wish to show Titan's performance while in training was mediocre. However, that in no way contravenes Titan's certification. From the testimony adduced at the suppression hearing it is apparent Defendant was provided with records concerning Titan's certification and the activities Titan and his handler underwent to obtain certification. Assuming Mr. Gonzalez reviewed the same records and concluded Titan performed poorly compared with other drug detection dogs, testimony to that effect would not be admissible. The question is whether Titan's training met minimum standards for certification. The certification addresses that directly.

### C. Capability of Drug Detection Dogs - Scientific Basis for Credibility of Dog Alerts

-11-

Defendant argues he needs the assistance of Mr. Gonzalez to help him determine the capability of drug-detection dogs. The Court disagrees. Because the capability of dogs to detect odors lies at the heart of Defendant's argument, even if unspoken, the Court will examine the scientific basis of scent detection by dogs.

It is common knowledge dogs have an ability much greater than humans to detect scents. This heightened ability allows dogs to detect scents that are not detectable by humans. This ability also allows dogs to detect scents that were once detectable by humans but are no longer detectable. It is also common knowledge dogs can detect the scent of things hours and even days after the thing has passed by or been removed. There is little doubt dogs possess olfactory[5] capabilities far superior to humans and are uniquely equipped for the task of detecting and distinguishing between minute levels of a given scent. Robert C. Bird, *An Examination of the Training and Reliability of the Narcotics Detection Dog*, 85 KY. L.J. 405, 408 (1997). Scent recognition is achieved through contact between a scent particle in the air and an olfactory receptor cell. A dog's snout contains a complex system of scroll-like passageways called turbinate bones which maximize the area available for receptor cells' exposure to air. Andrew E. Taslitz, *Does the Cold Nose Know? The Unscientific Myth of the Dog Scent Lineup*, 42 HASTINGS L.J. 17, 43 (1990). As a result of the turbinate bone structure, the total surface area of receptor cells inside a dog's snout is roughly equivalent to the surface area of the dog's entire body, whereas the comparable area in a human nose is the size of a postage stamp. *Id.* A typical German Shepherd has 220 million olfactory receptor cells versus 5 million in an average human. *Id.* The process of interpreting the responses of this enormous

---

[5]"Olfactory" is defined as "of, relating to, or connected with the sense of smell." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1572 (Philip Babcock Grove ed., Merriam-Webster, Inc. 1993) (1961).

Case 1:06-cr-00005-TRM-MCLC   Document 100   Filed 09/11/06   Page 12 of 19   PageID #: 212

quantity of receptor cells to scent particles in the air consumes approximately one-eighth of a dog's entire brain, far exceeding the percentage of the human brain dedicated to olfaction. *Id.*

The effect of this vast number of olfactory receptor cells is unclear. Bird, *supra* at 409. Some scientists believe the result is a dog's enhanced ability to detect minute levels of scent particles. *Id*; *See also* Richard E. Myers II, *In the Wake of Caballes, Should We Let Sniffing Dog's Lie?*, 20 CRIM. JUST. 4, 7 (2006) (discussing study at Auburn University finding dogs could detect odors in the air at a concentration of 500 parts per trillion). Others claim the increased number of cells allow a dog to more effectively differentiate between odors. Bird, *supra* at 409. The truth is likely somewhere between the two extremes. Taslitz, *supra* at 44. Regardless of the exact method of recognition, it is clear dogs have a natural ability to detect and recognize the smallest traces of odors. Bird, *supra* at 409.

Scientifically, it is without questions dogs have the capability to detect scent particles left from objects. It is also clear that those scent particles may remain in the air or on other objects after the object giving off the odors has been removed. These scent particles may remain behind for hours or days. If the scent particles are there in sufficient quantity to be detected by the dog, then the dog will smell the scent and, if properly trained, will alert.

Nothing in Mr. Gonzalez's proffered background suggests he will offer testimony to the contrary. To the extent he was offered as an expert to testify to the contrary, his expertise would be subject to question. If he had testimony to the effect that Titan was ill at the time of the alert in this case or for some other reason was not able to smell, that would be helpful and necessary assistance. However, the Court sees nothing in Counsel's arguments to suggest that is the case.

Based on this scientific background, the primary issue in determining the credibility of a dog's alert is not the capability or ability of a dog to accurately identify particular scents, but is instead the communication between the handler and the dog based on that indisputable ability.

**D. Training of Drug-Detection Dogs and Handler's Role and Credibility**

*1. Communication between drug-detection dog and handler*

The key component of drug-dog detection is the communication by the dog that it has recognized the target scent. There are two components of this communication, communication by the dog and recognition by the handler that the dog has detected the target scent. This is what is referred to as the dog's "alert." Dogs alert in many different manners. One dog may alert in one manner while another dog may alert in another manner. While the handler will recognize the dog's action as an alert, someone not familiar with the dog may not. Training plays the essential role in the communication of the alert between the dog and the handler.

*2. Training drug-detection dog to "alert"*

Regardless of natural ability, a dog without proper training cannot function as a drug-detection dog. *See United States vs. Outlaw*, 134 F. Supp. 2d 807, 813-14 (W.D. Tex. 2001) ("[I]t stretches the bounds of jurisprudential imagination to believe that a positive alert by an untrained dog . . . could be relied upon to establish probable cause."). A typical training procedure is summarized as follows:

> Training a dog is a relatively simple task. Trainers play with the dog using a towel, which the dog associates as its toy. Trainers then wrap a narcotic in the same towel and play fetch. As the dog repeatedly retrieves its toy, it associates the towel with the drug scent. Trainers then hide the drug without the toy. The dog searches for the drug, thinking it will find its plaything. When the dog finds the drug, the trainer gives the dog the toy, further associating the toy with the scent. After one drug is learned, trainers repeat the steps with other narcotics, and reinforce identification of drugs already mastered. By the end of the course, dogs learn how to detect most

-14-

common illegal narcotics.

Bird, *supra* at 411-12 (citations omitted). While training the dog is relatively simple, training a handler to correctly recognize how a dog responds to targeted narcotics typically requires more time and effort. *Id.* at 412. Handlers and dogs are paired at the beginning of a training program and continue to work together throughout the dog's years of service. *Id.* Because a dog's ability can change over a short period of time, a dog typically must pass periodic recertification exercises. *Id.* The United States Customs Service, an organization known for stringent certification standards, discards its dogs' performance records every 30 to 60 days, believing old records to be less probative of current skill. *Id.* at 415.

### 3. *Variables involved in communication*

Every dog sniff has four possible results: true positive, true negative, false positive, or false negative. *Id.* at 427. An alert with drug scent particles present is a true positive, whereas an alert with no drug scent particles present is a false positive. *Id.* Failure to alert when no drug scent particles are present is a true negative, and failure to alert when drug scent particles are present is a false negative. *Id.* Statistical analysis of reliability must take into account the type of alert category being measured and each category's unique potential for error. In controlled training environments where the location of drug scents is known in advance by trainers, negative alerts are easily categorized as true or false. In the field, however, they are often impossible to quantify because, in the absence of other factors establishing probable cause, a negative alert does not lead to a search and the presence or absence of drugs remains undetermined. Moreover, a positive alert where no drugs are found does not mean the dog did not detect drug scent particles. Drugs may well have been present but removed by the time the dog alerted leaving the scent particles behind.

-15-

Overlaying all of this is the issue of communication on the part of the handler. The handler must interpret the dog's action correctly. For example, if the dog in fact detects drug scent particles and alerts, and the handler fails to interpret the action as an alert, then this would erroneously be categorized as a false negative. Accounting for the interpretation required by the handler is not a subject amenable to testimony by an expert and thus Mr. Gonzalez's testimony would be of no help to the fact finder here.

### 4. *Difficulty in accurately measuring reliability*

As a result of the impossibility of truly determining accuracy in the field, measures of reliability in the field are typically based only on positive alerts. *Id.* at 426 (citation omitted) ("One common expression of canine skill involves counting the number of successes in alerting to narcotics."); *see also United States v. Navarro-Camacho*, 186 F.3d 701, 704 (6th Cir. 1998) ("[A]lthough Dingo occasionally alerted falsely, his rate of reliability was between 90 and 97 percent."). Since olfaction is based on contact between receptor cells and scent particles, a positive alert only represents a dog's detection of particles released from narcotics, not the narcotics themselves. Bird, *supra* at 409. Therefore, drugs may have at one time been present in the location of a positive alert, but a dog's alert is interpreted as a false positive because no actual drugs or residue were found. *Id.* at 409. Additionally, some studies posit 80% of all currency contains trace amounts of drug residue, indicating some true positives may not actually represent a finding of contraband. *Illinois v. Caballes*, 543 U.S. 405, 412 (2005) (Souter, J., dissenting) (citing *United States v. $ 242,484.00*, 351 F.3d 499, 511 (11th Cir. 2003), *vacated on other grounds by rehearing en banc*, 357 F.3d 1225 (11th Cir. 2004)). As a result, every statistical measurement of a dog's error rate likely contains unavoidable errors in the categorization of the alerts in question.

-16-

Case 1:06-cr-00005-TRM-MCLC   Document 100   Filed 09/11/06   Page 16 of 19   PageID #: 216

As Defendant correctly asserts in his supporting memorandum, a dog alert is based on a very subjective interaction between a dog and its handler (Court File No. 92) (citing Jeffrey S. Weiner & Kimberly Homan, *Those Doggone Sniffs Are Often Wrong: The Fourth Amendment Has Gone to the Dogs!*, THE CHAMPION, April, 2006, at 12, 13). For an alert to register, a dog must recognize a scent and physically indicate recognition, at which point the handler must interpret the dog's behavior as an alert. *Id.* That interaction is very individualized and is based on the sum of the handler and dog's relationship, experience, and training. The article cited by Defendant and filed as an addendum to the motion for reconsideration states, "[s]ome courts have expressed an appreciation of the role which handler interpretation plays in the process, although, with rare exception, that appreciation has not led to any less deference to the handler's testimony that the dog alerted." *Id.* The vital role the handler's interpretation plays is precisely why it is necessary to determine the reliability of a handler's testimony. The fundamental determination in evaluating the training and reliability of a drug-detection dog is the credibility of the handler's testimony. Because the handler is the only witness who can speak to the subjective interaction during a particular dog alert, it is necessary to defer to his testimony if it is found to be credible.

Because of the subjective nature of dog alerts, some commentators, like the authors of the aforementioned article, have sharply criticized the trust placed by most courts in drug dog alerts. *Id*. Justice Souter's dissent in *Illinois v. Caballes*, a case in which the Supreme Court placed great trust in dog alerts, criticized what he called "the infallible dog" as "a creature of legal fiction . . . belied by judicial opinions describing well-trained animals sniffing and alerting with less than perfect accuracy, whether owing to errors by their handlers, the limitations of the dogs themselves, or even the pervasive contamination of currency by cocaine." *Caballes*, 536 U.S. at 411-12

Case 1:06-cr-00005-TRM-MCLC Document 100 Filed 09/11/06 Page 17 of 19 PageID #: 217

(citations omitted). As Justice Souter recognized, however, the standard for probable cause is not infallibility. *Id.* at 413. Instead, probable cause has been defined as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion, and is said to exist when there is a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Lattner*, 385 F.3d 947, 951 (6th Cir. 2004) (internal quotation marks omitted)(citations omitted); *see also Illinois v. Gates,* 462 U.S. 213, 238 (1983) (reaffirming the fair probability based on the totality of the circumstances standard for probable cause). Even an alert by a dog with proven and obvious fallibility could reasonably meet the "fair probability" threshold when alerting to the presence of drugs, especially where the law enforcement officer suspects illegal activity before conducting the sniff. The Court does not see how Mr. Gonzalez, without the benefit of observing the interaction between Titan and his handler, could present helpful or necessary information in this regard.

### E. Necessity of Expert Services in a Challenge to Handler Credibility

Defendant argues he will not be able to properly challenge the admissibility of evidence with respect to contraband located by Titan without the aid of an expert (Court File No. 92). From the above discussion, it is obvious Mr. Gonzalez can offer little that would be helpful or useful under the standards of Fed. R .Evid. 702 and certainly nothing that could be considered "necessary" under the standards of 18 U.S.C. § 3006A(e). Counsel are often required to meet and confront unfavorable evidence. Tools available to counsel in such circumstances include cross-examination, offering contrary evidence, contradiction of proffered evidence, highlighting inconsistencies, and other common traditional means. The Defendant's task is to call into question the credibility of the testimony of Titan's handler. The fact finder will have had the benefit of seeing and hearing that

testimony. The fact finder can determine the credibility of the handler through those traditional tools commonly used, as well as the demeanor of the witness while on the stand. Should counsel believe he needs to develop an accurate explanation of Titan's training records, he has the ability to call as a witness those who prepared and produced those records.

As stated earlier, based on the reasoning advanced by Defendant, the Court would be obligated to approve general requests such as this in every case involving an alert by a drug-detection dog. Without any likelihood of utility such requests would have to be granted. These requests would not be "necessary" and would be unduly burdensome given how often dog alerts are used as a basis for probable cause. Under § 3006A(e), the Court must authorize counsel to obtain an expert's services if they are necessary to mount a plausible defense, and without them, the defendant's case would be prejudiced. *United States v. Gilmore*, 282 F.3d 398, 406 (6th Cir. 2002). Given the resources already available to Defendant, and the failure to show an expert would be useful for the purpose of addressing Detective Choate's credibility, Defendant has not met that standard.

## V. CONCLUSION

For the reasons stated above, the Court will **DENY** Defendant's Motion for Reconsideration of Appointment of Expert.

An Order shall enter.

                                               **/s/**
                                               **CURTIS L. COLLIER**
                                               **CHIEF UNITED STATES DISTRICT JUDGE**