UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

UNITED STATES OF AMERICA          )
                                  )
                                  )
                                  )          Case No. 1:06-CR-05-02
v.                                )          Collier/Lee
                                  )
WILLARD WAYNE HOWARD              )

## REPORT AND RECOMMENDATION

### I.      Introduction

Defendant Willard Wayne Howard ("Defendant") filed a motion to suppress [Doc. No. 50], which was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) [Doc. No. 54]. After the first suppression hearing and extensive briefing, a report and recommendation was issued [Doc. No. 78]. The Court accepted and adopted the recommendations except for the recommendation that the evidence found in the Defendant's vehicle be suppressed [Doc. No. 89]. The issue of whether the evidence found in the vehicle should be suppressed was referred to the undersigned for the taking of further evidence, if necessary, and for consideration of the independent source and inevitable discovery exceptions to the exclusionary rule [Doc. No. 90].

Defendant also filed a motion to suppress all evidence found during the search of the property located at 15712 Carlisle Road, Crittenden, Kentucky [Doc. No. 84]. This motion to suppress was also referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) [Doc. No. 88]. Subsequently, Defendant filed a supplemental motion to suppress the search of the property located at 15712 Carlisle Road [Doc. No. 109], which motion is also being addressed

herein.[1]

An evidentiary hearing with respect to the motions to suppress was held on January 4, 2007 [Doc. No. 123]. At Defendant's request and without objection, the portion of the hearing concerning evidence from the search of the Carlisle Road property was continued in order to allow Defendant additional time to complete certain investigative work concerning the Carlisle Road search warrant. After authorization for services related to the investigation was received [Doc. No. 146] and Defendant's investigation was completed, the evidentiary hearing concerning the search of the Carlisle Road property was held on August 16, 2007 [Doc. No. 149].

The parties have filed several pleadings addressing various issues raised in the pending motions to suppress [*e.g.*, Doc. Nos. 80, 81, 85, 86, 87, 110, 124, 125, 127, 151 & 152], which have been fully considered. For the reasons set forth herein, I **RECOMMEND** the following: 1) the remaining aspect of the motion to suppress concerning evidence located in the search of the Defendant's vehicle [Doc. No. 50] be **DENIED**; and 2) the motions to suppress evidence located in the search of the Carlisle Road property [Doc. Nos. 84 & 109] be **DENIED**.

## II.     Evidence

During the third hearing held August 16, 2007, the United States offered the testimony of agent Scott Hardcorn ("Hardcorn") of the Kenton County (Kentucky) police department concerning the warrant for and search of the Carlisle Road property. During the second suppression hearing held January 4, 2007, the United States offered the testimony of detective Eduardo Choate ("Choate") of the Bradley County Sheriff's Office. Defendant offered the testimony of detective

---

[1] After the motions to suppress were filed, Defendant's initial appointed counsel moved to withdraw due to the development of a conflict of interest [Doc. No. 112]. The motion to withdraw was granted and substitute counsel was appointed to represent Defendant [Doc. No. 114].

Joe Renner ("Renner") of the Bradley County Sheriff's Office. Both Choate and Renner testified at the first suppression hearing held March 16, 2006 and Renner also testified at the preliminary examination held on December 21, 2005. The Court has engaged in a thorough review of the evidence presented during the prior hearings [*e.g.*, Doc. Nos. 78-79, 89-90 & 100-101], which will not be repeated herein except as relevant to the remaining suppression issues.

**A.      Detective Choate's Testimony**

**1.      Testimony at the March 16, 2006 Suppression Hearing**

At the first suppression hearing, Choate testified that after he had arrested Defendant and walked him into the wrecker service office, he went back outside planning to search Defendant's Chevrolet Suburban [Transcript of March 16, 2006 motion to suppress proceedings, Doc. No. 75 at 47]. Prior to any search, however, Choate's supervisor, Lieutenant Queen, told Choate to retrieve and deploy Titan[2] on the Suburban [*id.* at 47-48]. Specifically, Choate testified:

> I went outside and back to where the vehicle was. And I was going to begin searching the vehicle, because I had been told that we had probable cause, to begin with, to search the vehicle. But my Lieutenant said, "No, before we go any farther, you know, let's go ahead and use your dog." And they had to drive me back to my patrol car that was a few blocks away, and I had to go bring a choke collar and bring the dog to the scene. And I used the dog around the vehicle.

[*Id. See also id.* at 101-03]. Choate estimated it took him around five minutes to retrieve Titan [*id.*

---

[2] At the first suppression hearing, Choate testified extensively about Titan's training and certification [*id.* at 9-11, 49-57, 70-91]. Choate testified Titan was certified as a drug-detection dog by the National Narcotic Detector Dog Association, and that Titan's training continued each month in accordance with departmental policy [*id.* at 51-56]. Choate stated Titan's performance as a drug-detection dog was excellent [*id.* at 55-56]. Choate testified that while Titan had alerted in situations where drugs were not found, he believes these were not "false" alerts, but were instead reactions to drug residues [*id.* at 55-59].

at 91].[3]

Choate testified he had not received Defendant's alleged consent to search the vehicle and had not been involved in any specific questioning of Defendant prior to the time he deployed Titan around the Suburban [*id.* at 48]. Specifically, Choate testified:

> Q: All right. At that point when your lieutenant tells you to go get the dog, had you spoken with [Defendant]?
>
> A: Only from the time that, you know, we got out of the car and he sat inside. But didn't really talk to him about anything.
>
> Q: All right. Did you ask him for consent to search at that point?
>
> A: No, not then.
>
> Q: Before you got the dog?
>
> A: No.
> . . .
> Q: I want the Judge to be very clear about how you recollect events. And are you sure that you did not have a conversation regarding the [D]efendant's consent to search prior to going to get the dog?
>
> A: I am positive. It was afterwards that I talked to him.

[*Id.*].

When Choate walked Titan around the Suburban, Titan alerted at the rear door on the right side [*id.* at 59-60, 103]. Choate put Titan back in his patrol car, informed his lieutenant that Titan had alerted, and walked back into the office to speak to Defendant [*id.* at 62-63]. After questioning Defendant about possible contraband in the Suburban, Choate searched the vehicle and found

---

[3] Shane McKee, another detective on the scene who testified at the first suppression hearing, estimated the total time Choate was absent from the wrecker service office to be ten minutes [*id.* at 123].

approximately $95,000 in cash [*id.* at 67-68].

## 2.    Testimony at the January 4, 2007 Suppression Hearing

At the second suppression hearing, Choate testified on direct examination that, if he had not

immediately arrested Defendant, he would have taken the following steps:

> When [Defendant and his passenger Amy Cornwell] had arrived at
> the wrecker service in Cleveland, Tennessee, we would have detained
> them due to reasonable suspicion and for investigative purposes due
> to the fact of the vehicle and the narcotics and them arriving in
> Cleveland to take possession of the vehicle. If he had denied consent,
> I would have done it just like I would have on a normal traffic stop
> on the side of the interstate, which is deploy my canine.

[Transcript of January 4, 2007 motion to suppress proceedings, Doc. No. 126 at 6]. Choate further

testified he would have detained the Defendant in an "investigatory posture" and would have

deployed Titan early on in the process [*id.* at 7]. On cross examination, Choate said he would have

relied upon Titan's alert for probable cause to search the Suburban [*id.* at 15-16].

Choate again testified about Titan's training and certification, stating both he and Titan have

been through an initial special training program supplemented by continued monthly training [*id.*

at 8]. Choate testified Titan received adequate training each month after March of 2005, when Titan

was certified, until December of 2005, when the Defendant was arrested [*id.* at 17-23].

Choate said he regularly spends time working with Titan each month, but he only documents

ten hours of training because of the pay limits imposed by the sheriff's department [*id.*]. He said

the ten hours allowed by the sheriff includes time spent preparing locations for training. Choate

agreed it was important to document training sessions, but only up to the ten hour limit set by the

sheriff's department [*id.*].

Choate was questioned about the specific training reports for August 27, 2005 and November

3, 2005 [*id.* at 24-27]. After he initially misconstrued the August report, Choate said the report reflects Titan was deployed twice and alerted on drugs twice [*id.* at 24-25]. During the November training, Titan apparently alerted on crack cocaine placed in a vehicle on the second sniff, but not the first [*id.* at 26-27].

Choate also testified he sometimes wears leather gloves when working with Titan or conducting a search but he wears latex gloves to handle evidence [*id.* at 29-30]. At times he snaps his fingers when working with Titan, but he does not know if snapping his fingers while wearing leather gloves could release a scent of drugs [*id.*]. Choate said he is not familiar with an opinion that a dog's detection ability can change over a short period of time [*id.* at 8-10].

**B.      Detective Renner's Testimony**

**1.      Testimony at the March 16, 2006 Suppression Hearing**

At the first suppression hearing, Renner testified he observed Choate and others speaking with Defendant, but did not see the arrest of Defendant or participate in the search of the Suburban [Doc. No. 75 at 23-24, 34].

**2.      Testimony at the January 4, 2007 Suppression Hearing**

Renner, who was called at the second suppression hearing as an adverse witness by Defendant, testified he observed Choate deploy Titan a second time [Doc. No. 126 at 36]. He could not recall whether Choate deployed Titan before or after Defendant made statements to Choate regarding the money in the Suburban [*id.* at 36]. Renner agreed he previously testified Choate told him that Defendant made a statement about the money being in the Suburban before Titan was deployed during the preliminary examination hearing [*id.* at 34-41]. Renner also said he was present when Choate "got his dog out again, walked him around the vehicle, and the canine alerted on the

money as well." [*Id.* at 38-39].

Renner affirmed his log entry describing Titan's deployment [*id.* at 40-41]. The log indicates Choate questioned Defendant about money in the Suburban prior to walking Titan around the vehicle [*id.*]. Renner testified his log states:

> Detective Choate asked how much [money. Defendant] stated around $100,000. At the that time Detective Choate got his canine partner out of his vehicle and proceeded to walk his partner around [Defendant's] vehicle. The canine had a positive alert on the rear of the vehicle. Once inside the vehicle Detective Choate and McKee located a shoe box with several stacks of money wrapped in Saran wrap. Detective Choate got his canine partner back out and proceeded to walk his partner around the vehicle again with the back door open with the shoe box sitting in the back. The canine hit positive on the shoe box.

[*Id.* at 40-41].

Renner testified the "primary reason" for the search was the consent obtained from Defendant [*id.* at 42-43].[4] Renner also testified Amy Cornwell ("Cornwell") was detained for approximately three to four hours, but was not arrested [*id.* at 43].[5]

## C.    Agent Hardcorn's Testimony

Hardcorn was the only witness to testify at the third suppression hearing held August 16, 2007. At the outset of the hearing, the parties agreed Defendant was the owner of both the tracts of land and trailers at issue: the property with the street address of 15712 Carlisle Road ("Tract One"

---

[4] At the preliminary examination hearing, Renner testified the search of the vehicle was the result of Titan's alert [Transcript of December 21, 2005 preliminary examination proceedings, Doc. No. 71 at 14].

[5] At the preliminary examination and first motion to suppress hearing, Renner testified Cornwell **was** arrested on the night at issue, but later released [Doc. No. 71 at 9, 11 and Doc. No. 75 at 23, 33, 38].

or "15712 Carlisle Road") and the adjoining property with the street address of 15690 Carlisle Road ("Tract Two" or "15690 Carlisle Road"). Located on Tract One is a blue pole barn (the "Barn") and a white, single-wide mobile home trailer with brown trim ("Trailer One"). Located on Tract Two is another mobile home trailer ("Trailer Two"). The parties also agreed the evidence which Defendant seeks to suppress, a money counter and scales, was found in Trailer Two located on the 15690 Carlisle Road property, which is the street address **not** contained in the search warrant, application or affidavit at issue.

For about the last four years, Hardcorn has been assigned to the Northern Kentucky Drug Strike Force ("Strike Force"). Hardcorn testified his main duty is to investigate crimes involving narcotics. Hardcorn testified officer Matthew Rolfsen ("Rolfsen") with the Strike Force received a telephone call from Renner on December 14, 2005 about this matter. Rolfsen then related his conversation with Renner to Hardcorn. Hardcorn stated it was standard operating procedure for him to receive information from other officers in the Strike Force. Hardcorn testified he and another member of the Strike Force wrote the majority of the affidavits and search warrants sought by the Strike Force and Hardcorn prepared the warrant application and signed the affidavit supporting the search warrant at issue.

Hardcorn testified Rolfsen told him Renner reported having telephone conversations with two individuals, a male and a female in northern Kentucky. Hardcorn testified he put this information in the affidavit for the search warrant and only recently learned the phone conversations were between Renner and Cornwell, not Defendant. Renner told Rolfsen that two individuals, Defendant and Cornwell, had been taken into custody in Tennessee and approximately $95,000 in cash had been seized from their vehicle. Hardcorn said the amount of money located in the

Suburban and the amount of cocaine located in the car driven by Antonio Bautista-Benitez ("Benitez") indicated a "good deal" for the purchaser but that it was a deal within reason for such a purchase between drug dealers with an ongoing relationship.

Renner reported Cornwell said that Benitez had been coming to Defendant's residence about once a week for a period of time. Renner also provided the license plate number of the Suburban driven by Defendant and Hardcorn ran a check on the license plate and learned the vehicle was registered to Defendant at 15712 Carlisle Road. Renner told Rolfsen he had made a number of telephone calls to (513) 324-6725 about retrieving Benitez's car. Hardcorn stated he ran a computer check on this phone number and the computer check indicated the number was a cell phone registered to Defendant at 15712 Carlisle Road. Hardcorn also ran a computer check on 15712 Carlisle Road and learned it was owned by Defendant. In addition, Hardcorn ran a check on Defendant's driver's license and learned Defendant had a criminal history of drug arrests, including an arrest for manufacturing methamphetamine at 15712 Carlisle Road.

Hardcorn testified that prior to preparing the affidavit for the search warrant, he drove to the property at 15712 Carlisle Road on the night of December 14, 2005. Hardcorn stated he drove up and down the road several times and observed the property from his car. He also pulled into the driveway to get a better look at the property. On cross examination, Hardcorn stated he did not get out of his car because he did not know who was present on the property or if they had been contacted and were aware Defendant had been taken into custody. Hardcorn stated he did not want to alert anyone who might be present that he was there to look at the property so he quickly pulled into and out of the driveway as if he was lost or just turning around. Hardcorn said because it was winter and the foliage was gone, he could see Trailer Two, including the wooden steps leading to

the front door, from his car.

Hardcorn stated he felt a sense of urgency in preparing the affidavit and getting the search warrant, because he was concerned evidence of drug trafficking might be present and he wanted to obtain and execute the search warrant before any such evidence could be removed from the property or destroyed. While he was observing the property, Hardcorn was quickly taking abbreviated notes about what he observed. He stated the Barn on Tract One is actually blue, but he erroneously either wrote brown in his notes or typed brown instead of blue in the search warrant application. Because he was preparing the affidavit with a sense of urgency in the early morning hours, he also typed "William" instead of "Willard" once in the affidavit. Hardcorn stated he typed the affidavit quickly, took it to the issuing judge's house, and it was signed at 1:35 a.m. on December 15, 2005. After the warrant was issued, Hardcorn, Rolfsen and other officers executed the warrant.

Hardcorn testified he did not know there were two tracts of land with separate addresses on Carlisle Road until he was contacted by counsel for the United States in early August, 2007 regarding the third suppression hearing. Upon learning there were two tracts of land, Hardcorn investigated the property. At the August 16, 2007 hearing, the United States introduced several exhibits, including Exhibits 19 through 24 which were identified as photographs of Tract One and Tract Two recently taken by Hardcorn. Exhibits 3 through 18 were identified as photographs taken by Rolfsen at the property on December 15, 2005, during the execution of the search warrant. Exhibit 1 was identified as the search warrant, application and affidavit and Exhibit 2 was identified as the warranty deed for both Tract One and Tract Two and related documents.

The Defendant also introduced several exhibits during the hearing. Defendant's Exhibit 1 was identified as the search warrant return and Defendant's Exhibits 2 through 4 were identified as

photographs of new appliances located in a tow trailer.[6]  Hardcorn testified Trailer One did not appear to be lived in on the night of the search. On cross examination, Hardcorn agreed Trailer Two appeared to be in the process of being remodeled and also did not appear to be lived in on the night of the search.  Nobody was at either trailer on the night of the search.

Hardcorn testified there is no mailbox for Tract Two, but there is a mailbox bearing Defendant's last name and the street number 15712 directly across the road from the driveway leading to the trailers.  Hardcorn testified there is a common gravel driveway for both trailers, which first leads to Trailer One.  Trailer Two is located approximately 100 yards from Trailer One.

Hardcorn testified that when he prepared the affidavit for the search warrant he thought Trailer One and Trailer Two were located on the same tract of land, 15712 Carlisle Road.  Hardcorn testified that after learning about Defendant's motion, he reviewed the property on the website for the Kenton County property value assessor ("KCPVA").  Hardcorn testified the KCPVA website showed a barn or garage as the structure on Tract One and showed Tract Two was a vacant piece of land.  Hardcorn testified he spoke with someone at the KCPVA office, who told him they had no knowledge of a structure on Tract Two.  Hardcorn testified he could not have contacted the KCPVA office at the time he prepared the affidavit for the search warrant because he was preparing the affidavit and search warrant at about 1:00 a.m. and the KCPVA office was closed.  Hardcorn further testified that even if he checked with the KCPVA, the information would have shown there was no residence on Tract Two.

Hardcorn stated that after learning of Defendant's motion to suppress in early August 2007,

---

[6]  Hardcorn stated he searched the tow trailer, which was the type of trailer that can be attached to a car for hauling purposes, but no evidence was located in it.  He agreed the warrant and application did not authorize a search of the tow trailer, mailbox or "outbuildings."

he also checked the website, linkgys.org, for northern Kentucky. The website includes aerial photographs of properties in the northern Kentucky area, although some of the photographs are not up-to-date. Hardcorn stated that for Tract One the website shows the bridge, gravel driveway and Trailer One. The aerial photograph for Tract Two shows a driveway leading away from Trailer One, but Trailer Two is not shown in the photograph. Hardcorn stated he was not aware of the linkgis.org website at the time he prepared the affidavit and search warrant, but even if he had been aware of the website and checked it, he would not have known Trailer Two was on Tract Two because even the currently available aerial photograph does not show Trailer Two. On cross examination, Hardcorn agreed certain property records were available on-line at the time of the search, but he did not run a check of the on-line property records.

Hardcorn testified when he prepared the affidavit and search warrant, he believed the Barn, Trailer One and Trailer Two were all on the same piece of property, 15712 Carlisle Road. He further stated it was his intention when he prepared the affidavit and search warrant to search the Barn, Trailer One and Trailer Two, and that is why he specifically listed all three structures in both the affidavit and search warrant. On cross examination, Hardcorn specifically denied the reference to Trailer Two in the warrant application was merely a reference point. Hardcorn agreed the mailbox was included in the warrant as a reference point, not because he wanted to search it. Hardcorn admitted he did not attempt to determine in which trailer Benitez allegedly stayed when at Defendant's property.

Hardcorn stated Rolfsen prepared and made the return. On redirect, Hardcorn testified Rolfsen signature appears on the return.

**III. Analysis**

Defendant, as the proponent of the motions to suppress, generally bears the burden of establishing his Fourth Amendment rights were violated by a challenged search or seizure. *See Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978). It is the government's burden, however, to demonstrate by a preponderance of the evidence that a particular seizure was based on probable cause. *United States v. Pena*, 961 F.2d 333, 338-39 (2d Cir. 1992); *see United States v. Baldwin*, 114 F. App'x 675, 681 (6th Cir. 2004) (government bears burden to establish stop based on reasonable suspicion qualifies as a *Terry* stop).

**A. Search of the Suburban**

In referring the remaining issues concerning whether the evidence obtained during the search of the Suburban should be suppressed, the Court stated:

> There is one additional legal issue the Court deems worthy of consideration that was not adequately explored or developed by the parties. Accordingly, the Court will withhold ruling on that one aspect of the R&R and **REFER** this one issue back to the magistrate judge for her to consider notwithstanding the arrest of Defendant, whether the evidence obtained from the Suburban would have been discovered anyway. It strikes the Court that possibly the inevitable discovery doctrine or the independent source doctrine might apply.

[Doc. No. 89 at 1-2].

As relevant to the referred issues concerning discovery of evidence in the Suburban, the United States argues the dog sniff and alert would have occurred during an investigatory detention of Defendant or Cornwell,[7] so the search results should not be suppressed under the independent

---

[7] It is unclear whether the United States claims the search was incident to a lawful arrest of Cornwell. The record in not clear whether Cornwell was arrested given Renner's conflicting testimony on this issue [Doc. No. 71 at 9, 11; Doc. No. 75 at 23, 33, 38; Doc. No. 126 at 43]. In any event, it appears unnecessary to address this issue at this time.

source and/or inevitable discovery doctrines [Doc. No. 125].

Defendant argues his unlawful arrest cannot be disregarded [Doc. Nos. 124, 127]. Defendant asserts that if the Court converts the unlawful arrest into an investigatory stop, it would deprive the Defendant of an opportunity to have the Court determine whether law enforcement "acted diligently before deploying the canine" and that "the record is void of any evidence that the actions of law enforcement were diligent." [Doc. No. 127 at 3]. Defendant argues it is impossible to separate Defendant's illegal arrest from the deployment of Titan, and thus the United States "has not met its burden of showing the discovery of monies at issue was wholly independent from his unlawful arrest." [*Id.*; *See also* Doc. No. 124]. Defendant also continues to argue the United States failed to establish Titan was properly certified or reliable so the alert does not constitute probable cause for the search.

Without question, under *Terry v. Ohio*, 392 U.S. 1 (1968), a police officer may "briefly detain a person or property for investigative purposes if the officer has a reasonable suspicion, supported by articulable facts that criminal activity has occurred or is about to occur." *United States v. Davis*, 430 F. 3d 345, 354 (6th Cir. 2005). *See also United States v. Garcia*, ___ F.3d ___, 2007 WL 2254435, * 5 (6th Cir. 2007) (citing *Smoak v. Hall*, 460 F.3d 768, 778 (6th Cir 2006)). To determine whether an investigatory detention comports with the Fourth Amendment, a two step analysis is used. First, the court determines whether, under the totality of the circumstances, "there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to a reasonable suspicion." *Davis*, 430-F. 3d at 354 (internal quotation and citation omitted). If the stop was proper, the court next moves to the second step of determining whether the intrusion by the law enforcement officials was

reasonable. *Id.*

In this case, while the Court has already held law enforcement officers did not have probable cause for the arrest of Defendant at the time he was arrested, the Court also held officers did have reasonable and articulable suspicion Defendant was part of the same criminal enterprise as Cornwell and Benitez [Doc. No. 89 at 6,10]. Therefore, as to the first step of the inquiry and as held by the Court, the officers could have legally detain Defendant for a reasonable period of time in order to ascertain his identity, to assure themselves he was not a threat, and to confirm or dispel their suspicions [*id.* at 10-11].

As to the second step of the inquiry, "[a]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. The scope of activities conducted during the investigative stop must reasonably be related to the circumstances that initially justified the stop." *Garcia*, 2007 WL 2254435, * 5 (quotations and citations omitted). With respect to the permissible scope of an investigatory detention, when officers reasonably suspect the occupants of a vehicle of illegal drug trafficking, a "canine narcotics sniff is directly related to investigating this suspicion." *Id.* at * 6. Both the Supreme Court and the Sixth Circuit have recognized a dog sniff conducted during a lawful stop that reveals no information other than the location of contraband does not violate the Fourth Amendment. *See e.g., Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000); *United States v. Place*, 462 U.S. 696, 707 (1983); *Davis*, 430 F.3d at 355.

As to duration, Defendant's argument that he is deprived of determining whether the law enforcement officers acted diligently before deploying Titan fails. The record is clear the time between Defendant's illegal arrest and the deployment of Titan was around ten minutes. Delays far in excess of ten minutes during investigatory stops have been upheld as reasonable. *See, e.g.,*

*Garcia*, 2007 WL 2254435 at * 5 ("duration of the stop was reasonable; the canine sniff was performed within a half hour of the stop"); *Davis*, 430 F. 3d at 354 (police had reasonable suspicion to detain suspect for thirty to forty-five minutes to wait for the first drug-detection dog to arrive); *United States v. Orsolini*, 300 F.3d 724, 730 (6th Cir. 2002) (detention reasonable where investigation lasted less than one hour with some 35 minutes spent waiting for the canine unit to arrive). *See also Illinois v. Caballes,* 543 U.S. 405, 408-09 (2005) (use of drug-sniffing dog that does not extend the length of a legitimate traffic stop does not violate the Fourth Amendment even though there were no specific and articulable facts to suggest drug activity). Thus, I **CONCLUDE** that the ten-minute detention of Defendant while Titan was retrieved and deployed lasted no longer than was necessary and that a detention of ten minutes was entirely reasonable because the officers had reasonable articulable suspicion of criminal activity.

The factual record concerning what the officers would have done with respect to Titan if they had not immediately arrested Defendant was not developed at the initial hearing, and the United States did not argue for application of the inevitable discovery or independent source doctrines, and thus the Court found it could not determine whether suppression of the currency located in the Suburban was appropriate based on the record. After further development of the argument and factual record, it is uncontroverted Choate initially planned to search the Suburban after the arrest of Defendant prior to deploying Titan. Unfortunately for Defendant, Choate was stopped prior to his planned search of the Suburban by his supervisor who instructed him to retrieve and deploy Titan prior to conducting a search. It is undisputed the search of the Suburban did not take place until after Titan's alert. Choate also testified that if he had not been told he had probable cause to arrest the Defendant on the spot (contrary to the Court's ruling), he would have detained the Defendant

16

in an "investigatory posture," would have deployed Titan, and would have relied upon Titan's alert for probable cause to search the Suburban.

There is some conflict in the record created by Renner's testimony regarding whether Titan was deployed before or after Choate asked Defendant about contraband in the Suburban.[8] Choate, who clearly testified he deployed Titan prior to asking Defendant about contraband in the Suburban during the first suppression hearing, was not questioned about this issue during the second hearing. Even if Renner's log and testimony accurately reflect what he believes Choate told him on the night at issue or soon thereafter, however, there is no indication Choate informed his lieutenant of any incriminating statements or consent to search by Defendant prior to receiving and following the instructions to deploy Titan. Instead, the undisputed evidence about the decision to deploy Titan is that Choate's supervisor told him to deploy Titan and he did so in spite of his belief that it was not necessary. Choate's testimony regarding his lieutenant's instructions and the steps he took to follow those instructions was credible. Choate also testified that even if Defendant had not consented to the search, he would have searched the Suburban based on Titan's alert.

### 1.    Independent Source Exception

Even when officers engage in illegal investigatory activity, evidence will be admissible if it is discovered through a source independent of the illegality. *Murray v. United States*, 487 U.S. 533, 537 (1988). With respect to the independent source exception to the exclusionary rule, the Court stated:

> The independent source rule holds that evidence will be admitted if
> the government shows that it was discovered through sources wholly

---

[8] The Court previously suppressed any incriminating statements by Defendant and found the alleged consent to search to be ineffective.

independent of any constitutional violation. The independent source doctrine is based on the idea the police should not be in a worse position than they would have been in absent any error or misconduct; therefore, the Court must determine whether, granting establishment of the primary illegality, the evidence has been come at by the exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint. The government bears the burden of proof in establishing the independent source doctrine.

[Doc. No. 89 at 8-9] (citations and quotations omitted). The Court further noted:

Instead of searching the Suburban incident to the arrest, Choate retrieved Titan and had him walk around the Suburban. If the officers relied solely on Titan's alert as a basis to search the Suburban, the independent source doctrine may or may not apply. The officers did not testify whether they relied solely on Titan's alert. Since the record is not fully developed on this issue, the Court will refer this issue to the magistrate judge for her to make a recommendation whether the evidence seized from the Suburban was wholly independent of the arrest.

[*Id.*]. The independent source doctrine provides that while the government should not profit from its misconduct, it also should not be made worse off than it would have been had the misconduct not occurred. *Wong Sun v. United States*, 371 U.S. 471 (1963).

The United States argues the evidence obtained from the search of the Suburban is admissible under the independent source doctrine because Titan's alert was independent of the Defendant's illegal arrest. Without question, the canine sniff took place only after Defendant's illegal arrest. The Sixth Circuit has held "when a canine narcotics sniff is performed as the result of the exploitation of a primary illegality, the fruits of that canine sniff must be suppressed." *United States v. Buchanon*, 72 F.3d 1217, 1226 (6th Cir. 1995) (illegal detention case).

In *Buchanon*, a truck was stopped along the highway due to mechanical difficulties when an officer stopped to render assistance. There was no hint of wrongdoing by the occupants of the truck

when the officer called another police unit to carry out a canine sniff investigation. *Id.* at 1221. Eventually, several officers detained the stalled truck's occupants pending the canine sniff. The Sixth Circuit found the dog sniff in Buchanon was "the result of the exploitation of the primary illegality." *Id.* at 1226. The Sixth Circuit concluded that using a dog in this manner was unlawful because the "troopers did not have reasonable articulable suspicion for seizing the defendants and the truck for a limited investigatory purpose." *Id.* at 1226. Here, however, as the Court previously concluded, the officers had reasonable articulable suspicion for detaining and questioning Defendant [Doc. No. 89 at 6, 10-11].

Unlike in *Buchanon*, in this case there was reasonable suspicion of drug trafficking. As argued by the United States, this case is more similar to the situation in *United States v. Moore*, 329 F.3d 399 (5th Cir. 2003). Although the Fifth Circuit in *Moore* expressly left undetermined whether the defendant's detention in an investigatory stop was a *de facto* arrest, the Fifth Circuit found the evidence was derived from an independent, legal dog sniff and was admissible in spite of the allegedly illegal arrest. The Fifth Circuit noted handcuffing the defendant did not cause the officers to find the evidence, and held the officers did not obtain the evidence as a result of the arrest; but rather, the evidence was the product of legal police activity. *Id.* at 404.

In another similar case, *United States v. Neatherlin*, 66 F. Supp. 2d 1157 (D. Mont. 1999), *aff'd*, 243 F.3d 551 (9th Cir. 2000) (table), *cert. denied,* 533 U.S. 960 (2001), the court held a drug dog's positive alert on the pickup truck of an illegally arrested suspect was an independent intervening event removing the results of the search of the truck from any exploitation of the illegal arrest. *See also United States. v. Burton*, 288 F.3d 91, 100 (3d Cir.) (suppression not warranted because police had independent probable cause to search vehicle, regardless of illegal arrest), *cert.*

*denied*, 537 U.S. 1039 (2002).

In deciding whether the independent source doctrine allows the admission of evidence that would otherwise be excluded, I have kept in mind the underlying question of whether, given the illegal arrest, the currency in the Surburban "has been come at by the exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488. In answering that question, I have considered whether application of the exclusionary rule to the currency would put law enforcement officers in the same, but not worse, position than they would have been in absent the illegal arrest. Here, I conclude application of the exclusionary rule would put the officers in a worse position than they would have been in absent the illegal arrest because the currency was discovered through a source independent of the illegal arrest.

Accordingly, I **FIND** the evidence was in fact discovered lawfully by means sufficiently distinguishable to be purged of the primary taint, and not as a direct result of the illegal arrest. Because the evidence was discovered through sources independent of the illegal arrest, I **CONCLUDE** the independent source doctrine applies.

### 2.    Inevitable Discovery Exception

The inevitable discovery exception to the exclusionary rule is closely related to the independent source doctrine. Under the inevitable discovery doctrine, the court may admit illegally obtained evidence if the evidence would have been inevitably discovered through independent, lawful means. *United States v. Vite-Espinoza*, 342 F.3d 462, 469 (6th Cir. 2003). In addressing the inevitable discovery exception, the Court stated:

> Although the parties do not raise the inevitable discovery doctrine, the Court believes this doctrine should also be addressed by the magistrate judge. Under the independent source doctrine, evidence that was *in fact* discovered lawfully, and not as a direct result of

> illegal activity, is admissible. In contrast, the inevitable discovery
> doctrine permits the introduction of evidence that *inevitably would*
> *have* been discovered through lawful means, although the search that
> actually led to the discovery of the evidence was unlawful.

[Doc. No. 89 at 10] (citations and quotations omitted). The exception applies when the government establishes the disputed evidence inevitably would have been discovered and seized by the officers following routine procedures. *Garcia*, 2007 WL 2254435, * 7 (citing *United States v. Vite-Espinoza*, 342 F.3d 462, 466 (6th Cir. 2003)).

I **FIND** the evidence would have been inevitably discovered pursuant to the reasonable detention of the Defendant, Cornwell and/or the Suburban for investigatory purposes. *See United States v. Kennedy*, 61 F.3d 494, 499-500 (6th Cir. 1995) (inevitable discovery exception does not require active pursuit of a previously initiated independent investigation), *cert. denied*, 517 U.S. 1199 (1996). Choate testified if he not arrested Defendant on the spot, he would have detained him for investigatory purposes and deployed Titan as part of an investigatory stop, as was his normal practice in a stop. As noted above, within some ten minutes of Defendant's arrest, Titan alerted to the Suburban creating probable cause for the search. The alert and the discovery of the currency created probable cause for an arrest of Defendant. Thus, even though the initial arrest of Defendant was premature, the discovery of the evidence was inevitable based on Titan's deployment and alert.

Accordingly, I also **CONCLUDE** the inevitable discovery doctrine applies.

### 3.      Titan's Alert Established Probable Cause

At the second suppression hearing, Defendant again attempted to elicit evidence to demonstrate Titan had not been shown to be a credible, reliable and properly certified drug-detection

dog.[9]  The Court previously held Titan is properly certified [Doc. No. 137][10], and also held:

> The fundamental determination in evaluating the training and reliability of a drug-detection dog is the credibility of the handler's testimony. Because the handler is the only witness who can speak to the subjective interaction during a particular dog alert, it is necessary to defer to his testimony if it is found to be credible.

[Doc. No. 100 at 17].  Choate's testimony at the first suppression hearing was found to be credible [Doc. No. 78 at 10] and Defendant did not object to this finding.  At the second hearing, Choate's again credibly testified about his handling of Titan and the alert at issue.

Chaote was cross examined about the amount of time spent on monthly training and about the August and November training reports. Chaote's testimony on these topics does not cause me to conclude his handling of and communication with Titan are not reliable or credible.  To the contrary, the evidence continues to demonstrate Titan is adequately trained and reliable, the communication between Choate and Titan is accurate, and Titan's alert is credible.

The record is undisputed that Chaote, following the instructions of his supervisor, had Titan engage in a sniff of the Suburban prior to a search within some ten minutes of the illegal arrest of Defendant.  Without question, the use of a drug-detection dog is an accepted investigative technique in the Sixth Circuit.  When a properly trained and certified drug-detection dog alerts to an item, the alert alone constitutes probable cause for a search.  *See United States v. Diaz*, 25 F.3d 392, 394-95 (6th Cir. 1994).  Thus, I **CONCLUDE** Titan's credible alert established probable cause for the search of the Suburban. *Id.*; *United States v. Lattner,* 385 F.3d 947, 951 (6th Cir. 2004), *cert. denied,*

---

[9]  Defendant's repeated request for funds to hire an expert regarding the canine alert is extensively addressed in the Court's memoranda and orders denying the request [Doc. Nos. 100, 101, 137, 138].

[10]  No evidence was offered at the second suppression hearing to dispute the conclusion that Titan is a properly certified drug-detection dog.

543 U.S. 1095 (2005); *Garcia*, 2007 WL 2254435, * 5. This is especially true given law enforcement officers' reasonable articulable suspicion of illegal activity prior to Titan's alert. Thus, the deployment of Titan was constitutionally permissible and Titan's alert was sufficiently reliable to establish probable cause to conduct a full-blown search of the Suburban. *See Caballes,* 543 U.S. at 409 (use of well-trained drug-detection dog during a lawful stop generally does not implicate legitimate privacy interests).

Accordingly, I **RECOMMEND** the aspect of Defendant's motion to suppress concerning the evidence located in the Suburban, *i.e.*, the $95,000 in cash, be **DENIED**.

## B.       Search of the Carlisle Road Property

The affidavit in support of the search warrant application for the 15712 Carlisle Road property describes the arrest of co-defendant Benitez, referred to as "Bautistia." The affidavit states that after finding five kilos of cocaine in a hidden compartment of Benitez's vehicle, subsequent controlled telephone calls were made to a telephone listed to 15712 Carlisle Road about retrieving Benitez's vehicle [Doc. No. 86 at 7; also Government's Exhibit 1 to August 16, 2007 suppression hearing]. The affidavit also states that during the controlled calls detectives "spoke with both a male and female on several occasions that stated they would be in route to pickup the vehicle, which they believed [] had been involved in an accident." [*Id.*].

The affidavit describes Renner's communications with Rolfsen on December 13 and 14, 2005 and the arrests of Defendant and Benitez and the discovery of the $95,000. The affidavit further states:

> Amy Cornwell told Detective Renner that [Defendant] told her [Benitez] comes and stays at [Defendant's] residence on Carlisle Road once a month for the past year and a half. Amy Cornwell further advised that she and [Defendant] did respond to Tennessee to

> pickup the vehicle in question from Northen Kentucky. Detective Joe Renner further stated he had arrested [Defendant] and charged him with Conspiracy to Traffic Cocaine.
>
> . . .
>
> **Acting on the information received, Affiant conducted the following independent investigation:**
>
> The Affiant had the Kenton County Dispatch Center run the registration of the vehicle [Defendant] drove to Tennessee. It was registered to [Defendant] of 15712 Carlisle Road. The Affiant also ran [Defendant's] driver's license, which also came back to the address on Carlisle Road. A criminal history was ran on [Defendant]. It was discovered that [Defendant] has had prior drug arrests in Kentucky. The most recent being a Manufacturing in Methamphetamine charge by the Northern Kentucky Drug Strike Force at the above listed residence.

[*Id.*]. The affidavit concludes with information about the affiant's experience with the investigation of illegal activity associated with controlled substances and his education concerning the same [*id.*].

The search warrant describes the property to be searched as:

> A singlewide trailer, which is white in color with brown trim. The trailer has two entrances, both facing toward Carlisle Road. The front door is facing a brown barn. A brown metal pole barn is attached to the white trailer with several additional wooden structures by the pole barn. A mailbox with the numbers "15712 " clearly posted on it is located across the street from the described property. Additionally, there is another single family trailer located approximately 100 yards to the right of the above described pole barn. This trailer is white in color with the front door facing toward Carlisle Road. The roof is dark in color with wooden steps going to the front door. All of the buildings described here are located on the property of 15712 Carlisle Road.

[*Id.* at 6].

Defendant argues evidence located during the search of the Carlisle Road property should be suppressed because: (1) the application supporting the warrant for the search of property located at 15712 Carlisle Road contained information obtained as a result of the illegal arrest of Defendant and illegal search of the Surburban; (2) contrary to claims in the warrant application, the Carlisle

Road property included two separate residential trailers located on separate parcels of property listed under separate street addresses; and (3) the warrant application fails to establish probable cause [Doc. Nos. 84, 109].

### 1. Legal Standard

The Fourth Amendment mandates a search warrant be based "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *U.S. Const. amend. IV.*  Thus, for a valid warrant three things are required. *Stanford v. Texas*, 379 U.S. 476, 481 (1965).  First, the warrant must be issued by a neutral, detached magistrate.  *Connally v. Georgia*, 429 U.S. 245, 250-51 (1977) (per curiam).  Second, there must be probable cause to justify a search warrant, *i.e.*, an affidavit must set forth facts which indicate "a fair probability exists that evidence of a crime will be located on the premises of the proposed search."  *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (internal citations omitted); *accord United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir.), *cert. denied*, 546 U.S. 813 (2005).  Third, the warrant must particularly describe the things to be seized and the place to be searched. *Stanford*, 379 U.S. at 511.  Defendant argues the second and third requirements are not met here.

With respect to the second requirement of probable cause, the reviewing court must consider the totality of the circumstances as set out in the four corners of the affidavit and answer "the commonsense, practical question [of] whether there is 'probable cause' to believe that contraband or evidence is located in a particular place." *Illinois v. Gates*, 462 U.S. 213, 230 (1983); *Whiteley v. Warden, Wyoming State Penitentiary*, 401 U.S. 560, 565 n. 8 (1971) (court limited to review of affidavit itself); *Frazier*, 423 F.3d at 531.  The issuing magistrate's "determination of probable cause

is afforded great deference" and should be overturned "only if [he] arbitrarily exercised his discretion." *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004).

The purpose of the third requirement of particularity is to avoid general searches. *See Maryland v. Garrison*, 480 U.S. 79, 84 (1987); *Garcia*, 2007 WL 2254435, * 7-8. This requirement also serves to exclude other locations as the possible target of the search. *United States v. Gahagan*, 865 F.2d 1490, 1496 (6th Cir.), *cert. denied*, 492 U.S. 918 (1989). "It is enough if the description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended. *Steele v. United States*, 267 U.S. 498, 503 (1925). *See also United States v. Pelayo-Landero*, 285 F.3d 491, 495-96 (6th Cir. 2002); *Knott v. Sullivan*, 418 F.3d 561, 568 (6th Cir. 2005); *Gahagan,* 865 F.2d at 1497.

### 2.    The Probable Cause Determination

Defendant's first and third arguments are intertwined and will be addressed together here. Defendant argues the facts contained in the warrant application and supporting affidavit were obtained as a result of the illegal arrest of Defendant and unlawful search of the Suburban. Defendant argues the Court should excise the facts related to the identity of Defendant and the currency located in the Suburban and that after excising the allegedly illegally obtained evidence from the warrant application/affidavit, there is insufficient evidence to establish probable cause. Defendant also argues the even when considering all of the information provided in the warrant application/affidavit, including the allegedly tainted information, probable cause for the search is not established.

A warrant request must describe the relationship between the alleged criminal conduct, the property to be seized and the place to be searched. *United States v. Van Shutters*, 163 F.3d 331, 336-

37 (6th Cir. 1998), *cert. denied*, 526 U.S. 1077 (1999). "To justify a search, the circumstances must indicate why evidence of illegal activity will be found 'in a particular place.' There must, in other words, be a 'nexus between the place to be searched and the evidence sought.'" *United States v. Carpenter*, 360 F. 3d 591, 594 (6th Cir.), *cert. denied*, 543 U.S. 851 (2004) (quoting *Van Shutters*, 163 F. 3d at 336-37). The "critical element in a reasonable search is not that the owner of the property is suspected of crime, but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *United States v. Pinson*, 321 F.3d 558, 564 (6th Cir.), *cert. denied*, 540 U.S. 912 (2003) (quoting *Zurcher v. Standford Daily*, 436 U.S. 547, 556 (1978)).

The evaluation of whether probable cause exists "requires consideration of whether there were reasonable grounds to believe at the time of the affidavit that the law was being violated on the premises to be searched." *United States v. Lord*, No. 05-6351, 2007 WL 1174402, * 4 (6th Cir. April 20, 2007) (quoting *Mays v. City of Dayton*, 134 F.3d 809, 814 (6th Cir.), *cert. denied*, 524 U.S. 942 (1998)). In *Lord*, the Sixth Circuit noted its recent probable cause precedent has "generally eschewed a rule-bound, formulaic approach to probable cause determinations" for a "more holistic, 'totality-of-the-circumstances' approach." *Id.* at * 5.

Turning to the merits of Defendant's argument about his identity, and as previously held by the Court, the identity of Defendant is information law enforcement officers were entitled to learn based on their reasonable articulable suspicion even though they did not have probable cause for his arrest at the time he was arrested [Doc. No. 89 at 6, 11]. Thus, there is no basis for excising Defendant's identification or information learned about Defendant, such as his criminal record, from the warrant application. Likewise, I have concluded the currency is not subject to suppression for

the reasons set forth above.  Thus, there is no basis for excising information about the currency located in the Suburban from the warrant application.  Likewise, once Titan alerted and the cash was located, there was probable cause for the arrest of Defendant.  Therefore, information regarding Defendant's arrest should not be stricken from the warrant application.

The affidavit describes the arrest of Benitez and Defendant, the five kilos of cocaine in a hidden compartment in Benitez's vehicle, subsequent controlled telephone calls made a telephone listed to 15712 Carlisle Road about retrieving Benitez's vehicle, Defendant's arrival in Tennessee with $95,000 in cash to pick up the cocaine-laden vehicle, Cornwell's statements including that Defendant said Benitez stayed at Defendant's residence on Carlisle Road once a month for the past year and a half and that she and Defendant responded from Kentucky to pickup Benitez's vehicle.

The affidavit also lists independent investigation efforts, including running the registration of the vehicle Defendant drove to Tennessee and finding it registered to Defendant at 15712 Carlisle Road, running Defendant's driver's license, which also listed Defendant's address on Carlisle Road, running a criminal history on Defendant and discovering Defendant had prior drug arrests in Kentucky, including an arrest for manufacturing methamphetamine at the 15712 Carlisle Road residence.[11]

In short, there is probable cause based upon the information contained in the affidavit. The affidavit sets forth facts which indicate a fair probability evidence of drug trafficking would be located at the Carlisle Road property.  *See Carpenter*, 360 F. 3d at 594.  The affidavit shows a nexus between the 15712 Carlisle Road property and evidence of drug trafficking by including information

---

[11]  It is not clear if this refers to an arrest at the residence or manufacturing at the residence. This ambiguity, however, does not alter my analysis.

about co-defendant Benitez's visits to the Carlisle Road property once a month for over a year, calls concerning retrieval of Benitez's cocaine-laden vehicle from a phone number linked to the Carlisle Road property, verification Defendant's residence was listed as 15712 Carlisle Road on his vehicle registration and driver's licence, and Defendant's most recent drug arrest for manufacturing methamphetamine at his residence at 15712 Carlisle Road.[12] Considering the totality of the circumstances as set out in the four corners of the affidavit and answering the commonsense, practical question of whether there is probable cause to believe that contraband or evidence is located in a particular place, the issuing judge reasonably determined there was a fair probability evidence of a crime would be found at 15712 Carlisle Road.

Accordingly, I **FIND** the warrant application is sufficient to support a finding of probable cause for issuance of the search warrant under the applicable totality-of-the-circumstances approach when not stripped of the information about the arrest and currency located in the Suburban.[13]

If, however, the Court rejects the recommendation contained herein and suppresses the currency from the United States's case-in-chief as illegally obtained evidence, then the question remains whether there was sufficient evidence to establish probable cause for the warrant after the

---

[12] The United States has not argued probable cause to search Defendant's residence based on any information in the affidavit indicating Defendant was a drug dealer with continual operations. *See e.g.*, *United States v. Jones*, 159 F.3d 969, 974 (6th Cir. 1998); *United States v. Davidson*, 936 F.2d 856, 860 (6th Cir. 1991); *United States v. Miggins*, 320 F. 3d 384 (6th Cir. 2002), *cert. denied*, 537 U.S. 1130 (2002); *United States v. Goward*, 188 F. App'x 358-59 (6th Cir. 2006). Therefore, this issue will not be addressed herein.

[13] Defendant notes an apparent conflict in the case law of the Sixth Circuit regarding whether the *Leon* good-faith exception is applicable to a warrant secured in part on the basis of information obtained from an illegal search or seizure citing *United States v. Davis*, 430 F. 3d 345 (6th Cir. 2005) and *United States v. McCain*, 444 F. 3d 556 (6th Cir. 2005). Based upon the conclusions set forth herein, it is not necessary to address the alleged conflict.

illegally obtained evidence is excised from the affidavit. Therefore, in the interest of presenting a thorough report and recommendation, I will address whether the affidavit provides probable cause for issuing the search warrant for Defendant's residence after excising the information about the arrest of Defendant and the currency located in Defendant's Suburban.

Under the independent source rule, the presence of unlawfully secured information in a search warrant affidavit does not necessarily make a subsequently obtained warrant invalid. *Id.* at * 4 (citing *Jenkins*, 396 F.3d at 758). As held in *Lord*,

> a court reviewing a request for the suppression of evidence seized during the execution of a warrant issued on the basis of an affidavit containing both (1) information acquired during an unlawful search and (2) lawfully obtained, untainted information must evaluate the sufficiency of the untainted affidavit to see if probable cause exists without the tainted information. If the application for a warrant contains probable case apart from the improper information, then the warrant is lawful and the independent source applies. . ..

*Id.* (internal citations and quotations omitted).

To the extent the district court decides to suppress evidence located during the search of the Suburban, I also **FIND** the affidavit, even if stripped of information about Defendant's arrest and the $95,000 in cash, has sufficient information for the issuing judge to have reasonably believed evidence of a crime would be found at Defendant's residence, 15712 Carlisle Road.

Accordingly, I **CONCLUDE** there was probable cause for the issuance of the warrant.

### 3.      Particularity Requirement

Defendant also contends the search was improper because the property described in the application as a single residence is actually two separate residential trailers on separate tracts of property listed under separate street addresses. This issue was the primary focus of the third suppression hearing. It is undisputed Trailer Two sits on a parcel of property with a street address

of 15690 Carlisle Road, not 15712 Carlisle Road.  Trailer Two is where the evidence at issue, a money counter and scales, was found.  I **CONCLUDE** the warrant meets the particularity requirement of the Fourth Amendment even though the proper address for Trailer Two was not included in the application or search warrant.

In a case with similar issues, *Gahagan*, 865 F.2d at 1492, agents obtained a search warrant listing the premises to be searched as "7609 Douglas Lake Road, Johannesburg, Michigan."  The affidavit for the warrant described the premises as:

> 7609 Douglas Lake Road, Charleton, Township, Otsego County, Johannesburg, Michigan, three story wood frame house with natural wood siding with an unattached four-car garage with natural color siding.  Also located on the property is a single story wood frame log cabin-type structure painted dark brown in color.. . .

*Id.*  The house to be searched was known to the officers who executed the search as House B and the cabin to be search was known as Cabin # 3.  *Id.* at 1493.  The officer who executed the search warrant not only participated in the search, but he "conducted a pre-search briefing session for the officers who participated in the search and provided them a description of the premises to be searched.  *Id.* at 1493, 1499.

The defendants sought to exclude the evidence seized as a result of the execution of the warrant on the ground the warrant failed to particularly describe the place to be searched.  *Id.*  In particular, the defendants "asserted that the address of '7609 Douglas Lake Road' alone was insufficient to include Cabin # 3" because "Cabin # 3 is a separate residence with its own address

of 7577 Douglas Lake Road." *Id.* at 1494.[14]  The Sixth Circuit first found its inquiry would be limited only to the evidence seized as the result of the search of Cabin # 3 because it was alleged that only the description of Cabin # 3 was inadequate.  *Id.* at 1496.  The Sixth Circuit upheld the search, finding the description in the affidavit supporting the warrant sufficiently described both House B and Cabin # 3 "so that the executing officers could reasonably ascertain the premises to be searched." *Id.* at 1497.

The Sixth Circuit found the executing officers knew the search was for Cabin # 3 and House B and held "when one of the executing officers is the affiant who describes the property to the judge, and the judge finds probable cause to search the property as described by the affiant, and the search is confined to the areas which the affiant described, the search . . . is in compliance with the Fourth Amendment." *Id.* at 1499.  Finally, the Sixth Circuit found that because it determined the affidavit in support of the search warrant described Cabin # 3 with particularity, it was unnecessary for it to determine whether the good faith exception set forth in *United States v. Leon*, 468 U.S. 897 (1984) was applicable to the situation.  *Id.*

Defendant's argument that Trailer Two was included in the warrant as a reference point for providing directions only, like the mailbox, is contrary to the credible testimony of Hardcorn that he included Trailer Two because he intended to search it. The warrant and application specifically describe Trailer Two and its location, including its distance from the Barn, the color, the roof, the

---

[14]  There was also evidence there were no house numbers on either House B or Cabin # 3 and there was a mailbox at the end of Driveway # 1, which serviced House B and Cabin # 3.  The address of 7609 Douglas Lake Road was posted at the end of Driveway # 1 and the address of 7577 Douglas Lake Road was posted at the end of Driveway # 2 which serviced another house, House # 4, but did not service Cabin # 3 at the time of the execution of the search warrant.  There was no address posted at the end of Driveway # 3, which serviced Cabin # 3 at the time of the execution of the search warrant.  *Id.* at 1494.

direction the front door faced, and the wooden steps leading to the door. This description was

sufficient for an officer to identify the residence to be searched even without the correct street

address. This is especially so here where Hardcorn not only prepared the affidavit, but was also part

of the team executing the search warrant and testified he include a description of Trailer Two in his

affidavit and warrant because he intended to search it after observing the property. *Id. See also*

*United States v. Pelayo-Landero*, 285 F.3d 491, 497 (6th Cir. 2002); *United States v. Brown*, 49 F.3d

1162, 1168-69 (6th Cir. 1995).

Accordingly, I **FIND** the warrant meets the particularity requirement of the Fourth

Amendment.

### 4. Rule 41 Claims

Defendant also asserts the money counter and scales seized from Trailer Two should be

suppressed due to the failure of the government to comply with Fed. R. Crim. P. 41 [Doc. No. 152

at 7]. Fed. R. Crim. P. 41 states in pertinent part:

> **(f) Executing and Returning the Warrant**
> . . .
> **(2) Inventory.** An officer present during the execution of the warrant
> must prepare and verify an inventory of any property seized. The
> officer must do so in the presence of another officer and the person
> from whom, or from whose premises, the property was taken. If
> either one is not present, the officer must prepare and verify the
> inventory in the presence of at least one other credible person.

Hardcorn testified Rolfsen signed the return of the executed search warrant. Defendant

asserts because the return of the warrant was not signed by two persons, the government has failed

to comply with Rule 41 and the evidence seized should be suppressed. As recognized by the

Defendant,[15] "[t]here is no statutory, or constitutional, exclusionary rule requiring exclusion of evidence lawfully seized pursuant to a search warrant because of the failure of a police officer to file an inventory." *United States v. Dudek*, 530 F.2d 684, 687 (6th Cir. 1976). Where there is a lawful search and seizure and "the complaint is that there was a failure to comply with a subsequent related requirement which does not constitute part of the search and seizure, but is to be performed only once the search and seizure is completed," there is no prejudice to a defendant nor a violation of any of his fundamental rights. *Id.* at 687-88. *See also United States v. Perez*, 405 F. Supp.2d 852, 855 (N.D. Ohio 2005) ("Violation of Rule 41 of the Federal Rules of Criminal Procedure does not give rise to suppression.") (citing *United States v. Ware*, 161 F.3d 414, 424-25 (6th Cir. 1998)).

Accordingly, I **FIND** it is not necessary to determine whether a violation of Rule 41 occurred as any such violation would not give rise to suppression under the circumstances.

### 5.    Inaccurate Information in the Application

To facilitate a complete review of all issues, I note Hardcorn's affidavit does contain some misinformation. The Defendant has not claimed Hardcorn intentionally or with reckless disregard included misinformation and Defendant has not attempted to make the required showing for what is commonly referred to as a *Franks* hearing. *See Franks v. Delaware*, 438 U.S. 154, 171 (1978). Defendant confirmed he was not seeking a *Franks* hearing at the August 16, 2007 hearing. *See also* Doc. No. 148. Under these circumstances, I **FIND** the misstatements contained in Hardcorn's affidavit are innocent misstatements that should not vitiate the otherwise sufficient warrant and application. *Id.*; *United States v. Rodriguez-Suazo*, 346 F.3d 637, 648 (6th Cir. 2003).

---

[15] Defendant's counsel, M. Keith Davis, is commended for both zealously representing his client and fulfilling his obligation as an officer of the court by citing applicable Sixth Circuit precedent that is not consistent with Defendant's position on this issue.

Accordingly, I **RECOMMEND** Defendant's motions to suppress all evidence found during the search of the property located at 15712 Carlisle Road, Crittenden, Kentucky [Doc. Nos. 84, 109] be **DENIED**.

**IV.     Conclusion**

For the reasons stated herein, I **RECOMMEND** that Defendant's motions to suppress all evidence found during the search of the property located at 15712 Carlisle Road, Crittenden, Kentucky [Doc. Nos. 84, 109] be **DENIED**.  In addition, I **RECOMMEND** that the remaining aspect of the motion to suppress regarding the evidence seized from the Suburban [Doc. No. 50] be **DENIED**.[16]

s/*Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[16] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party.  Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure.  Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985).  The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general.  *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).